In re **FOLDING CARTON ANTITRUST LITIGATION.**

**No. MDL 250.**

United States District Court,
N. D. Illinois, E. D.

Oct. 4, 1979.

---

PRETRIAL ORDER NO. 61A

MEMORANDUM AND ORDER

ROBSON and WILL, Senior District Judges.

This cause is before the court on the report and recommendations of the folding carton fee committee. For the reasons hereinafter stated, the report is adopted by the court as its report as herein modified, and an award of fees and expenses are made in accordance with the committee's recommendations pursuant to Pretrial Order No. 61.

After we preliminarily approved the proposed settlements of all of the class claims, we directed the parties to prepare a notice to the class of a hearing on the settlements and the requested fees and expenses. We directed plaintiffs to prepare petitions for the award of fees and expenses to be accompanied with detailed time records. We further determined that the fee petitions and time sheets should first be considered by an attorney fee committee composed of two attorneys with substantial leadership roles in the litigation—Mr. Perry Goldberg, the lead counsel for plaintiffs' class, and Mr. James B. Sloan, the coordinating secretary for plaintiffs' class—and an outside attorney with no prior contact with this litigation, Mr. Thomas J. Boodell, Jr. Mr. Goldberg and Mr. Sloan were selected to be members of the committee because of their intimate firsthand knowledge of the work done by the various attorneys in the litigation resulting from their leadership positions in the litigation and from the liaisons maintained throughout the proceedings between the executive committee and the other working committees of plaintiffs' counsel. Mr. Boodell was selected as our impartial representative on the committee in a position analogous to that of a special master. His function was to communicate with us about the work of the fee committee and to represent us in the work of the committee. The committee was to make recommendations on fees and expenses for all of

the attorneys submitting fee petitions and Mr. Boodell was to solely make recommendations on the fees and expenses of the offices of Messrs. Goldberg and Sloan.

Our experience with the fee committee was even better than we expected. The work of the committee was conscientious and diligent to a degree reflective of the highest professional standards. The court reviewed the report and fee and expense recommendations of the committee prior to the September 13, 1979, hearing on the settlements and the fees and the expenses. At the hearing, we provided an opportunity for class members and their attorneys to object to the overall fees requested of $17,662,754 and expenses of $970,061 and the fee and expense recommendations made by the committee as to each specific law firm and the accounting firm of Touche Ross & Company. No objections were made to the specific recommendations despite an approximate reduction of $4 million in the fees recommended from the fees requested and an approximate reduction of $20,000 in the expenses recommended from the expenses requested.

We have reviewed and we agree with the committee as to all of the recommendations made in Volume II and its supplement of the fee committee report. Pretrial Order No. 61 is a final order of judgment based on the recommended awards of fees and expenses. We also have reviewed the report contained in Volume I and adopt it as herein modified as our review of the history of this litigation, the law applicable to fee determinations, and the standards to be applied in the fee and expense determination in this litigation.

## APPENDIX

Fee Committee Report as Modified by the Court

## REPORT OF FOLDING CARTON FEE COMMITTEE

## VOLUME I

FOLDING CARTON FEE COMMITTEE

THOMAS J. BOODELL, JR.
Boodell, Sears, Sugrue, Giambalvo & Crowley
One IBM Plaza-Suite 2650
Chicago, Illinois 60611
PERRY GOLDBERG
Specks & Goldberg, Ltd.
180 North LaSalle Street
Chicago, Illinois 60601
JAMES B. SLOAN
Sloan and Connelly, P.C.
111 West Washington Street
Chicago, Illinois 60602

## TABLE OF CONTENTS

A.  Background and Procedure of Fee Committee ....................... 248
B.  Brief History of Folding Carton Antitrust Litigation .................. 250
    1.  The Criminal Cases ........................................ 250
    2.  Class Action Matters ...................................... 251
        a) Class Certification ...................................... 251
        b) Defendant Attacks on Rule 23 ............................. 251
        c) Matters Not Contained in Criminal Indictments ................. 252
            (1) Milk Cartons ....................................... 252
            (2) Additional Defendants .................................. 252
    3.  Nationwide Discovery Program ............................... 252
        a) Immunity Grants for Deponents ........................... 252
        b) Grand Jury Document Discovery .......................... 253
        c) Fifth Amendment Issues .................................. 253
    4.  Proof of Damages ......................................... 253
    5.  Settlement Negotiations ..................................... 254
    6.  The Challenge of Illinois Brick ............................... 254
    7.  The Quality of Plaintiffs' Counsel ............................. 255

C. History of Attorney Fee Awards ................................. · 255

D. Standards Adopted by the Fee Committee and Recommended to This Court - 263
  1. The Time-Rate Analysis ...................................... 264
    a) The Hours Worked ...................................... 264
      (1) Duplicated Hours ...................................... 264
      (2) Hours not Spent for the Benefit of Plaintiff Class ........... 264
      (3) Reasonableness of Time Claimed .......................... 264
    b) Hourly Rates ........................................... 264
  2. Other Factors ........................................... 265
    a) Contingent Nature of Class Action Litigation .................. 266
    b) Skill and Ingenuity of Counsel ............................. 267
    c) The Benefits Conferred Upon the Class ...:................... 268
    d) Public Policy Considerations ............................... 269
    e) The Specific Recommendations for Attorneys in This Litigation ... 270

CONCLUSION................................................. 270

## A. Background and Procedure of Fee Committee.

The Fee Committee (hereinafter the "Committee") was appointed by Order dated June 29, 1979, "to review the fee petitions submitted by attorneys for the class plaintiffs." A copy of the Order is attached as Exhibit 1. Mr. Boodell was advised of his appointment by phone by Judges Robson and Will which was his first contact with any person concerning any aspect of this litigation.

Shortly thereafter, Mr. Boodell met with Messrs. Goldberg and Sloan.[1] Mr. Boodell was advised of the nature of the actions, the settlements that had been entered into, and generally informed of the history of this particular litigation. Mr. Boodell then read in detail the following pertinent documents, inter alia :

1) All Pretrial Orders and opinions issued by the Court in MDL 250.

2) All newsletters sent by plaintiffs' lead counsel to other plaintiffs' attorneys during the pendency of this litigation.

3) Class Action Briefs.

4) Plaintiffs' Memoranda and Appendices in Support of the Settlements.

5) All reported opinions in the criminal proceedings, U. S. v. Alton Box Board, 76 CR 199.

6) Manual for Complex Litigation, Section 1.47, pertaining to attorneys fees.

7) Numerous cases concerning the state of the law on attorney fees in class action litigation, particularly such cases as Lindy, Grinnell, Equity Funding, Liebman, and others listed in the Fee Committee Letter dated July 5, 1979, referred to below.

The Committee then met and prepared a letter to guide plaintiffs' counsel in the submission of fee applications. A draft of the letter was read on the phone by Mr. Boodell to both Judges Robson and Will (the Court being in recess), and their suggestions were received. A second draft was prepared and again read by Mr. Boodell to the Judges for their suggestions and approval, and the final letter, as approved, was mailed to all Plaintiffs' Counsel on July 5, 1979. A copy of that letter is attached hereto as Exhibit 2.

All plaintiffs' counsel seeking fees were required to file fee petitions with the Court, copies to each member of the Committee, on or before July 20, 1979. Fifty-two fee petitions were received requesting a total value in fees of $17,662,754 and in expenses of $970,061. The total value of fees and expenses as filed in the petitions was reported to the Court by the Committee and

---

1. Mr. Boodell had never before met Mr. Goldberg. He had previously met Mr. Sloan on a professional basis but had no contacts with him for over seven years prior to his work on the Fee Committee in this case.

the figures, as recited above, were used in the Notice of Hearing on Proposed Class Action Settlements and Proposed Plan of Distribution which was approved by the Court on July 25, 1979, and mailed to all class members. Subsequently, the Committee prepared charts of fees and expenses as requested in each petition and under date of August 4, 1979, sent all charts to each petitioner and the Court. The charts showed the total hours, hourly rates, multipliers, extended values and expenses for each person requesting fees in this litigation.

On August 16, 1979, Mr. Boodell met with both Judges in Judge Robson's chambers to discuss the procedures and general responsibilities of the Committee. The Judges emphasized their intentions that the fees be fair to the class members and to the lawyers participating for the benefit of the class. They further emphasized that the fees reflect the realities of participation and achievement as demonstrated in the course of the litigation and the results of the settlements which were now pending before this Court. The Judges stated that the proper place for the Committee to start its work was to analyze the daily time records and hourly rates requested by the petitioning attorneys. The Committee then was to evaluate and assess whatever other factors, such as risk and skill, etc., which might add to or detract from the requested hourly rates.

From July 20, to August 28, 1979, the Committee reviewed in detail each submitted fee petition and accompanying daily time sheets and cost vouchers. The first inquiry after reading each petition was to examine carefully the reported time as reflected in the daily time sheets. All petitions were read by at least two Committee members and most petitions were read by all Committee members.[2] Time sheets were

read *in full* by at least one member of the Committee. All expense vouchers were examined by paralegals and secretaries under the guidance of Committee members. The Committee met on an almost daily basis during this period and discussed at great length each petition as it was being reviewed.

With the approval of the Judges, the Committee sent a letter scheduling a meeting of all plaintiffs' counsel in Chicago for August 28, 1979. A copy of that letter dated July 31, 1979, is attached as Exhibit 3. The meeting was intended to further advise the Committee of the significant aspects and problems of the litigation, give the Committee a chance to ask questions of the attorneys participating in the case, and give all counsel a further chance to put on the record whatever statements they desired on their own petitions, on other petitions, and on guidance factors generally for the benefit of the Committee. The meeting was held in Room 1903 of the Federal Courthouse in Chicago, 219 South Dearborn Street, on August 28, 1979, from 9:30 a. m. until 6:20 p. m. A transcript of the proceeding was made and filed with the Court. The Committee is advised that both Judges have read the transcript.[3]

Subsequent to the meeting of August 28, the Committee reexamined each petition and developed preliminary standards applicable to each petition and reached preliminary recommendations for each attorney and paralegal. The standards and recommendations included establishing 1) the number of hours devoted to the litigation that benefitted the class, 2) hourly rates for each attorney and paralegal, and 3) an achievement or "contingency" factor for each attorney.

In reaching its preliminary standards and recommendations, the Committee thorough-

---

2. The petitions of Specks & Goldberg, Sloan and Connelly and Mandell & Wright were reviewed in full by Mr. Boodell without specific input from other members of the Committee.

Mr. Boodell would like to note the assistance he received from Martha L. Ashenhurst, an associate of his law firm, in the preparation of Volumes I and II of this Report.

3. The transcript of these proceedings has been submitted to the court as part of the Report of the Folding Carton Fee Committee. This report is available for public inspection in the office of the Clerk of Court for the United States District Court for the Northern District of Illinois.

ly examined the legal literature, including reported cases and law review articles. The Committee also had available to it a study of Professor Arthur R. Miller, "Attorneys Fees in Class Actions, a Study Prepared for the Federal Judicial Center," dated July, 1979. The Committee also met with and requested a report from Dr. Robert E. Lucas, Jr., Professor of Economics at the University of Chicago, which report primarily examines the incentive effects of different methods of setting fees in this type of litigation. Professor Lucas' report is discussed more fully below and is attached hereto as Exhibit 4.

After the Committee developed its preliminary standards and recommendations, Mr. Boodell met with Judge Robson at length on September 4, 1979, and reported orally on the work of the Committee and reviewed orally the Committee's preliminary standards for reaching recommendations regarding time spent, hourly rates and achievement factors. After discussion, Judge Robson indicated that the Committee should, subject to Judge Will's hearing and commenting on the oral report, prepare a written report to the Court encompassing the standards and the preliminary recommendations, with the report to be available on or before September 13, 1979. Since Judge Will was out of town, Mr. Boodell called Judge Will and made his oral report by phone. After discussion, Judge Will agreed that the Committee prepare its written report as indicated above.

The Committee subsequently worked out specific recommendations for each petition and began the preparation of this Report. At this time, the Committee also received Plaintiffs' Joint Statement Regarding the Pending Applications for Awards of Attorneys' Fees, which has been filed with the Court. Finally, prior to filing this Report, each petitioning law firm has been advised in person or by phone of the Committee's recommendations regarding that firm and given an opportunity to make final comments before the formal filing of the Re-

port with the Court. Detailed recommendations and an explanation of the basis for each recommendation are contained in Volume II of this Report.[4]

B. *Brief History of Folding Carton Antitrust Litigation.*

This litigation was commenced in early 1976. More than fifty civil antitrust suits were filed around the country after federal indictments of 23 folding carton manufacturers and 47 individuals were obtained by the Justice Department. Plaintiffs' counsel elected an Executive Committee and commenced work on organizing the litigation. The MDL Panel of the Federal Judiciary issued its Consolidation and Transfer Order on May 25, 1976, transferring the case to the Northern District of Illinois. The case was assigned to Judges Hubert L. Will and Edwin A. Robson and the Executive Committee was confirmed by Order of Judge Will dated July 2, 1976. On July 12, 1976, a listing of Committee Assignments was distributed to all counsel, which listing is attached hereto as Exhibit 5.

Judge Will at the pretrial hearing on July 2, 1976, expressly directed counsel to "maintain the necessary records . . . on the basis of time actually expended." At this early date and continuing throughout the course of the litigation, plaintiffs' counsel were continually reminded and instructed by both Judges to keep accurate records, to be efficient and economical in the use of their time, not to duplicate time and not to spend excessive time in the tasks required during the course of the litigation.

The Committee includes in this section of the Report a short history of the litigation, highlighting significant battles and turning points as a background for the later discussion of fee recommendations.

1. *The Criminal Cases.*

The filing of the civil suits was preceded by government indictments of 23 corporations and 50 individuals for price fixing. The government tried its case against one defendant corporation, Consolidated Pack-

---

4. Volume II is available for public inspection in the office of the Clerk of Court for the United

States District Court for the Northern District of Illinois.

aging, and two individuals. The Company was found guilty. However, not guilty verdicts were returned by the jury against the individuals. In addition, 22 corporate co-defendants and 48 individual co-defendants pleaded *nolo contendere* and were sentenced by Judge Parsons. *See U. S. v. Alton Box Board Co., et al.*, 1976–20 Trade Cases ¶ 61,190.

One significant difference between the government and the civil cases was the scope of the conspiracy alleged in the civil cases. Plaintiffs here alleged a nationwide conspiracy which created significant problems of proof, both as to liability and damages. The government cases only needed to show a series of conspiracies against individual national accounts.

The civil plaintiffs were undoubtedly helped considerably by some of the evidence developed by the government. The Hencel diary, a notebook that allegedly recorded the time and content of numerous price fixing conversations was extremely significant, yet it proved to be a two-edged sword by buttressing the individual and regional nature of the alleged price fixing activities. The defendants used it effectively to tear down and place at issue the class action and conspiratorial allegations of the plaintiffs.

2. *Class Action Matters.*

a) *Class Certification* :

Plaintiffs obtained class certification for a class of approximately 35,000 purchasers of folding cartons demonstrating that a nationwide conspiracy is susceptible to nationwide class treatment. Plaintiffs successfully countered arguments that regional marketing, the fact that not all conspirators sold folding cartons in all markets, and myriad product variations and market permutations precluded class action certification. In certifying the class herein, the Court considered unique factual issues pertinent to this particular industry, see Pretrial Order No. 20, 75 F.R.D. 727 (N.D.Ill. 1977), and set the standards to be applied in similar industries with equivalent variations among defendants, class members and products. *See, e. g.*, the following decisions

which were based in part on Pretrial Order No. 20: *In re Corrugated Container Antitrust Litigation*, MDL 310, 80 F.R.D. 244 (S.D.Tex.1978), and *In re Cement and Concrete Litigation*, MDL 296, 1979–1 CCH Trade Cases ¶ 62,502 (D.Ariz.1979). The exhaustive factual and legal analysis of defendants' plant capacity, production methods, technology and sales techniques contained in plaintiffs' Class Action Reply Brief demonstrated to the Court that an apparent regionalized industry was susceptible to management as a nationwide class and subject to proof of violation necessary to support class certification. The class certification issue was vigorously fought on both sides and demonstrated excellent lawyering by the attorneys representing the plaintiff class indicative of their fine performance throughout the Folding Carton litigation.

b) *Defendant Attacks on Rule 23* :

(1) Defendants repeatedly attacked Rule 23 as a viable method of resolving multiparty disputes. In opposing class certification, defendants challenged the constitutionality of Rule 23 on due process and equal protection grounds. Plaintiffs' Reply Memorandum emphasized the constitutional safeguards built into the Rule. This Court's Pretrial Order No. 20, 75 F.R.D. 727 (N.D.Ill.1977), essentially adopted plaintiffs' arguments, and is the first written decision rejecting the notion frequently advanced by defendants that Rule 23 is fundamentally improper.

(2) Defendants sought from class plaintiffs detailed disclosure of profit and loss data. The Court initially granted defendants' motion. Only after plaintiffs' repeated and fervent argument did the Court reconsider and limit its ruling to those plaintiffs seeking to recover damages for lost profits in addition to overcharges. This ruling was crucial to the continued viability of Rule 23, since few parties would come forward as class representatives if they were required to make detailed disclosure of confidential profit and loss information while other class members sat on the sidelines.

(3) Significant disputes arose with regard to the Court's impartiality and the "settlement guidelines" established by the Court, which resulted in several interlocutory appeals and a mandamus action. Plaintiffs successfully opposed defendants' positions, and all appeals and the writs were dismissed.

c) *Matters Not Contained in Criminal Indictments* :

(1) *Milk Cartons* : The criminal indictments did not cover milk cartons. Milk cartons were included in the folding carton definition approved by the Court and the milk carton market was reliably estimated as one-quarter of the total folding carton market. The milk carton defendants attempt for pretrial severance of plaintiffs' milk carton claims was successfully opposed by counsel for plaintiffs' class, and the motion for trial severance of milk carton claims was deferred. Pretrial Order No. 17. The significance of inclusion of milk cartons was estimated at the Fee Committee Meeting with Plaintiffs' Counsel on August 28, 1979 by Mr. Sachnoff when he stated that 25% of the settlement fund, or approximately $50,000,000 was attributable to milk cartons. See Transcript, August 28, 1979, p. 23; Settlement Memorandum, July 9, 1979, pp. 60, 66.

(2) *Additional Defendants* : Three of the defendants in this litigation were not included in any criminal proceedings.[5] Settlements with these defendants total $6,437,-500, further increasing the size of the fund available to plaintiff class.

3. *Nationwide Discovery Program.*

Intensive discovery was commenced early in the case. For discovery matters, plaintiffs' counsel were organized into committees for each defendant. The criminal proceedings assisted plaintiffs in gaining access to relevant information such as Grand Jury testimony and the Hencel diary. Still, class counsel reviewed hundreds of thousands of documents, assembled evidence linking each defendant into the nationwide conspiracy, identified key personnel and transactions for deposition inquiry, prepared comprehensive deposition notebooks, and took 87 depositions on a schedule established by the Discovery Committee and approved by the Court. Many hours were spent in the discovery process, but it appears that by and large there was a minimum of inefficiency, waste and duplication. Plaintiffs' efforts from the beginning under the strong guidance and direction of the Court were aimed at preparing the case for trial. Document discovery work is dull drudgery but absolutely essential to the successful preparation of a case for trial. Counsel participating in this basic trial preparation are to be highly commended for their work.

a) *Immunity Grants for Deponents* :

During plaintiffs' first wave depositions, plaintiffs were confronted with a series of Fifth Amendment pleas in response to every substantive question. Plaintiffs were faced with a "stonewall" Fifth Amendment defense which had the effect of concealing relevant information crucial to plaintiffs' claims. Plaintiffs were able to secure an early grant of immunity for witness Roman Hencel. Then in April and May, 1978, settlement negotiations in the civil damage suit between the Federal government and defendants reached a resolution stage. It appeared that no further immunities would be sought or approved by the Justice Department. Defendants' Fifth Amendment defense was novel and it was uncertain whether plaintiffs would ultimately prevail on motions to compel testimony by witnesses invoking the defense. Therefore, the assurance of further immunity grants was critical to plaintiffs' case.

On May 3, 1978, two of plaintiffs' lead counsel met with the Assistant Attorney General of the United States in charge of the Antitrust Division, and members of his staff. As the result of this meeting, the Justice Department postponed the resolution of the Government's civil action and at plaintiffs' request processed numerous, un-

---

**5.** Gulf States, Georgia Pacific and Olinkraft.

precedented immunities in this civil litigation. This decision was announced in open Court shortly thereafter by the Justice Department, and the procedures to implement the grants of immunity were commenced on an expedited schedule in judicial districts throughout the country where the deponents were found, and a number of valuable, substantive depositions were taken shortly thereafter.

b) *Grand Jury Document Discovery*:

Plaintiffs sought disclosure of certain secret Grand Jury materials. Plaintiffs' initial efforts were directed at subpoenae, presentence reports and statements in aggravation, which had been made available to the defendants or their employees or attorneys. The Court, after briefing and argument, ordered the materials released for plaintiffs' perusal. The defendants pursued the matter unsuccessfully both in the Seventh Circuit by Writ of Mandamus, and, by seeking a Writ of *Certiorari* from the U. S. Supreme Court.

c) *Fifth Amendment Issues*:

Two important Fifth Amendment issues arose in the discovery context. First, in response to plaintiffs First Wave Interrogatories Nos. 6 and 7, defendant corporations claimed inability to gather evidence about pricing contacts from their own employees because of the Fifth Amendment rights of those employees. After intensive briefing the Court ruled, in Pretrial Order No. 22, that defendants were to answer the interrogatories.

Second, all individual deponents initially asserted Fifth Amendment privileges requiring plaintiffs to file motions and briefs compelling defendants to give deposition testimony. Plaintiffs argued that the then-completed, industry-wide criminal proceeding (in which widespread grants of testimonial immunity had been granted witnesses for their appearances before the Federal Grand Jury) eliminated any real risk of prosecution on account of civil deposition testimony. When the Department of Justice asserted that a risk of prosecution remained, plaintiffs contended that any testimony compelled by this Court could not be used in any subsequent prosecution, and that the risk of such prosecution was at best remote. In Pretrial Order No. 41, the Court granted plaintiffs' motion to overrule the privilege claims of witnesses who were not granted civil immunities by the Justice Department. While this Order was subsequently reversed on appeal, several depositions were taken under the guidelines of Pretrial Order No. 41 and the defendants were forced to face realistically a trial on the merits.

These issues are illustrative of the tough, unrelenting defense and the difficulties encountered by plaintiffs during the course of this major class action antitrust litigation.

4. *Proof of Damages.*

Because of the alleged variations among products, regions, suppliers, purchasing practices and other market factors, plaintiffs faced substantial problems in devising damage proof with class-wide application. Though plaintiffs prevailed on the *permissibility* of the class-wide damage proof during the argument over class certification, development of a sound damage theory proved substantially more difficult.

In retrospect, plaintiffs' damage theory is deceptively simple. It is based on the Hencel diaries and a comparison of Weyerhaeuser periods "on the phone" and "off the phone." By using the latter periods as the competitive benchmark, plaintiffs could establish the conspiratorial overcharge during the period "on the phone." As the Court knows, damage estimates computed by this method are approximately $169 million for the four year period from 1971–1974, $30 million *less than* the amount actually recovered by the class in this litigation.

Although the theory is simple, it is proper to point out that extensive time was spent in its development and in insuring that the theory would prove successful upon a trial on the merits. It is also proper to note that without damages there can be no recovery for the benefit of the class, even though liability is convincingly established.

## 5. Settlement Negotiations.

The $200,000,000 settlement achieved in this litigation constitutes, on the plaintiffs' theory of the case, 118% of the single damages sustained by the entire class on total purchases from defendants for four years. This result reflects plaintiffs' policies that a) no settlements were to be consummated until full and complete economic data was obtained from each defendant and b) plaintiffs would continue to prepare vigorously for trial during any settlement negotiations.

The settlement was the largest dollar settlement in the history of class action litigation at the time it was made, and is the highest settlement ever achieved as a percentage of single damages, i. e., 118%. Compared to settlements approved as fair, adequate and reasonable in other cases the result is outstanding. For example, in Newman v. Stein, 464 F.2d 689 (2d Cir. 1972), the Court approved a settlement representing 14% of potential recovery; in City of Detroit v. Grinnell Corp., 356 F.Supp. 1380, 1386 (S.D.N.Y.1972), aff'd, 495 F.2d 448 (2d Cir. 1974), the Court approved a settlement amounting to 9–11% of estimated damages; in In Re Four Seasons Securities Law Litigation, 58 F.R.D. 19, 37 (W.D. Okl.1972), the Court approved a settlement of less than 8% of estimated damages; in Helfand v. New America Fund, Inc., 64 F.R.D. 86, 92 (E.D.Pa.1974), the Court approved a settlement of 5% of damage claims filed; in In Re Sugar Antitrust Litigation, MDL 201 (N.D.Cal.), the Court approved partial settlements of 30.90%, 54.02%, and 47.90% of estimated damages for four years; in Dorey Corp. v. E. I. duPont de Nemours and Co., 426 F.Supp. 944, 947 (S.D. N.Y.1977), the Court approved a final settlement of approximately 55% of estimated damages; in Mersey v. First Republic Corp. of America, 43 F.R.D. 465, 1967–69 CCH Fed.Sec.L.Rep. ¶ 92,304 p. 97, 422 (S.D.N.Y. 1968), the Court approved a 5–10% final settlement; and in In Re Anthracite Coal Antitrust Litigation, 79 F.R.D. 707 (M.D.Pa. 1978), the Court approved a final settlement of 28% of estimated damages for four years.

The $35,000,000 [6] offered by defendants on March 24, 1977 to settle this litigation amounted to 20% of single damages and was within the range of settlements approved by other courts, indicated above. The increase to $200 million is significant and indicative of plaintiffs' purpose to obtain maximum benefit for the class which is in the highest standards of the legal profession and the purposes of Rule 23.

The amount should also be viewed in the context of the statute of limitations defense, which in antitrust actions is four years. The conspiracy alleged in the complaints terminated in mid-1974. The government indictments were returned in February, 1976. The four year statute, applicable if fraudulent concealment could not be proved for earlier periods, would go back to February, 1972, leaving only approximately two years and nine months vulnerable to damage, claims, absent fraudulent concealment. The $200 million settlement then can be described as more than 200% of single damages for two years and nine months.

## 6. The Challenge of Illinois Brick.

The decision in the now-famous Illinois Brick case [7] was handed down during the pendency of this litigation, subsequent to class certification. Approximately five to six percent of the class as certified was composed of indirect purchasers. Soon after the decision, a flurry of congressional activity began, directed at legislatively repealing what was considered an injudicious opinion.

During the summer of 1978, no fewer than six plaintiffs' attorneys in the Folding Carton Litigation undertook lobbying efforts against the proposed legislation which would eradicate Illinois Brick. Class counsel assessed the chances of its passage, and

---

**6.** The actual offer was substantially less because of various conditions attached by defendants.

**7.** Illinois Brick v. Illinois, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977).

settlement negotiations were patterned around every possible contingency. The ultimate settlement achieved contained a built-in walk-away provision, by which defendants could, at their election, rescind the entire settlement agreement in the event such a bill was passed before December 31, 1978. This provision constituted an innovative and unusual tactic, since in all other cases faced with this problem the settlement agreements provided that in the event of passage of the *Illinois Brick* bill, defendants' liability would remain fixed and the plaintiff class would be expanded to include indirect purchasers, thereby lowering the ultimate recovery available to each class member. Ultimately, the bill was defeated, and the walk-away provision was never implemented.

### 7. *The Quality of Plaintiffs' Counsel.*

Excellent lawyering by plaintiffs was evident throughout and undoubtedly contributed to the success of plaintiffs in this litigation. One of the defendants' lawyers commented privately to Mr. Boodell that "Everything that could have been fought about was. . . . The plaintiffs for the most part were extremely well-organized and effective." He went on to say that just the organization of the case was extremely difficult, that most of the discovery was very hard fought with innumerable 12(d) conferences and difficult pretrial conferences.

The Committee invited the Chairman and Co-Chairman of Defendants' Executive Committee to the meeting at the Federal Courthouse on August 28, 1979. At Mr. Boodell's request, both men made a brief statement. Their remarks emphasized the hard fought nature of this litigation.

### C. *History of Attorney Fee Awards.*

Fees in this type of litigation are awarded under the equitable fund doctrine. This doctrine was first enunciated by the Supreme Court in 1881, in *Trustees v. Greenough*, 15 Otto 527, 105 U.S. 527, 26 L.Ed. 1157 (1887). There, the Court held that the plaintiff, who brought a successful action against the trustees of a fund, was entitled to recoup his costs expended for attorney's fees. This notion was in contradistinction to the traditional American Rule which holds that each party to a lawsuit must bear the costs of his own attorneys' fees. The departure from the rule was warranted because a fund was created for the benefit of a number of beneficiaries, and it was determined fair to pay plaintiff's legal fees out of the fund which would benefit all beneficiaries. The plaintiff was allowed to recoup his costs from all claimants to the fund, in accordance with the proportion of the fund to which each claimant was entitled. *Id.*, 15 Otto at 532, 105 U.S. at 532.

Three years later in *Central Railroad v. Pettus*, 113 U.S. 116, 5 S.Ct. 387, 28 L.Ed. 915 (1884), after counsel had successfully recovered certain assets of the railroad for the benefit of their client *and* other creditors similarly situated, they petitioned the court for legal fees over and above those secured from their client by virtue of a fee agreement. The Supreme Court held that the attorneys were entitled to receive compensation from the fund itself. As a result of *Pettus*, attorneys were considered to have a direct cause of action against the fund. In *Pettus*, the complaint was brought in the form of a class action, setting the stage for the present day procedure. A modern enunciation of the common fund doctrine may be found in *Mills v. Electric Auto-Lite*, 396 U.S. 375, 389–97, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970).

One of the early cases in this century setting forth standards to be employed when a court must determine appropriate attorneys' fees was *In re Osofsky*, 50 F.2d 925 (S.D.N.Y.1931). There, attorneys representing the trustee of a bankrupt estate, voided a fraudulent transfer, resulting in increased value to the estate. In awarding fees to counsel, the court cited the following factors as guidelines:

(1) The time which has fairly and properly to be used in dealing with the case, because this represents the amount of work necessary. (2) The quality of skill which the situation facing the attorney

demanded. (3) The skill employed in meeting that situation. (4) The amount involved, because that determines the risk of the client and the commensurate responsibility of the lawyer. (5) The result of the case, because that determines the real benefit to the client. (6) The eminence of the lawyer at the bar, or in the specialty in which he may be practicing. *Id.* at 927.

The Court emphasized that the elements were to have different relative weights in each and every case, depending on the facts involved. It then observed that in many cases there is an extra factor to be considered, the one that was to be known in later cases as the contingency factor.

> That is the fact that in bankruptcy very often futile quests for assets have to be made. Many times, however much ingenuity and time attorneys may expend, they may not be able to get anything for the estate by their efforts. It is then a question, as in salvage at sea, of no cure, no pay. *Id.* at 927.

He went on to cite the necessity of awarding generous fees as an incentive for attorneys to both bring such cases, and to put forth their best legal efforts in the process. The guidelines set forth in *Osofsky* have been implemented up through the present by judges faced with the task of awarding attorney fees in class actions. They form the basis of DR2–106 of the Code of Professional Responsibility.[8]

The factors listed in *Osofsky*, and the Code of Professional Responsibility served for many years as guidelines to the courts; yet the ultimate judicial resolution of a class action fee award virtually always entailed the use of a percentage-of-recovery formula.

The percentages ran fairly high, and in some cases were clearly disproportionate to the amount of labor expended by counsel to achieve the end result. Excessive windfalls to purportedly undeserving counsel led to judicial and public disenchantment with the practice of awarding fees on a percentage basis. The opinion by Judge Decker in *Illinois v. Harper & Row Publishers, Inc.*, 55 F.R.D. 221 (N.D.Ill.1972), reflected the bench's rising dissatisfaction with what he termed, the "contingency fee syndrome:"

> I have some difficulty accepting the premise that a contingent fee contract on a fixed percentage basis will ultimately result in a reasonable and fair fee . . . These contracts . . . generally provide for a fixed percentage fee whenever a case is settled, without any reference to the quality of services rendered or the time and effort required to effect the settlement. As the size of the class action settlements increases, the fallacy of adhering to a fixed percentage fee formula becomes more evident. *Id.* at 223.

In 1974, the Third Circuit rendered an opinion in *Lindy Bros. Builders v. American Radiator*, 487 F.2d 161 (3d Cir. 1974) (*Lindy I* ), which has acted to shift the emphasis in fee awards away from the size of the recovery, and toward the actual time and labor spent in litigating a class action suit. The case, however, does not represent the radical departure from the traditional method of awarding fees that seemed apparent at first blush. The court retained the notion that awards should be determined through the informed discretion of the trial court (in accordance with *Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed.

---

8. Code of Professional Responsibility, DR2–106(B). Factors to be considered as guides in determining the reasonableness of a fee include the following:

(1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.

(2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.

(3) The fee customarily charged in the locality for similar legal services.

(4) The amount involved and the results obtained.

(5) The time limitations imposed by the client or by the circumstances.

(6) The nature and length of the professional relationship with the client.

(7) The experience, reputation, and ability of the lawyer or lawyers performing the services.

(8) Whether the fee is fixed or contingent.

1184 (1939)) and that such an award will stand unless an abuse of discretion has been detected. 487 F.2d at 166. The elements put forth in *Osofsky* and the Code of responsibility are also recognized in *Lindy I.*

The significance of the *Lindy I* decision is two-fold. First, it warned the District Court that an award of fees based on the automatic percentage-of-recovery formula would no longer be tolerated. Second, when calculating fees, the District Court was to use as a proper starting point the number of hours spent achieving the class recovery times a normal billing rate. The multiplication of these two factors would yield the "lodestar" figure. (Note that the time expended is a vital element for consideration under the Code of Professional Responsibility [DR2–106(B)(1) and (3)], and as posited by *In re Osofsky, supra,* at p. 927). The Court stated that determination of the lodestar figure did not signal the end of the analysis, but stressed that time and rate factors were too often accorded scant weight in the fee award process, allowing the phenomenon of excessive fee awards to persist.

> Before discussing the other factors to be considered in fixing fees, we stress, however, the importance of deciding, in each case, the amount to which attorneys would be entitled on the basis of an hourly rate of compensation applied to the hours worked. This figure provides the only reasonably objective basis for valuing an attorney's services. *Id.* at 167.

Two other factors were cited by the *Lindy I* court, namely the contingent nature of the litigation, and the quality of services rendered by counsel in prosecuting the action. The contingency element encompassed such considerations as whether class counsel had entered into any guaranteed fee agreements, and whether the class action was preceded by a government suit involving the same basic defendants and activities. The first consideration is likewise listed in DR2–106(b)(8). Nonetheless, since *Lindy*, courts appear to have viewed the contingency factor from many disparate and contradictory angles. The lack of consistency in weighing the contingency factor has led to grossly varying fee awards based on what appear to be similar fact patterns.

The quality factor posited by *Lindy* is to be assessed by analyzing factors which were previously set forth in DR2–106(b)(1), (4), and (7), and in *Osofsky, supra,* at 927.

> In evaluating the quality of an attorney's work in a case, the district court should consider the complexity and novelty of the issues presented, the quality of the work the judge has been able to observe, and the amount of the recovery obtained. This last factor may be the only means by which the quality of an attorney's performance can be judged where a suit is settled before any significant in-court proceedings. 487 F.2d 161, 168.

In retrospect, *Lindy* did not overhaul the method of awarding fees, but emphasized the time-rate analysis and de-emphasized the amount of recovery analysis. In *Lindy*, one highly respected court had taken the initiative to interpret and realign the factors which had been determinative of past fee awards. While pre-*Lindy* courts were aware of the factors which were to be considered in awarding attorneys fees, e. g., those put forth in *Osofsky* and later codified in DR2–106, they were more inclined to measure awards in terms of a percentage of the total recovery than to try and assign a monetary value to the various factors.

Despite the *Lindy I* pronouncements, it soon became apparent that more clarification was needed. The Third Circuit subsequently retreated slightly from what had been seen by others as an adamant adherence to a time-rate analysis. When the *Lindy I* Court remanded the case to the District Court to determine counsels' fee award in light of the standards enunciated in that opinion, the District Court interpreted the opinion as requiring that a time-rate analysis be applied initially, but that consideration be given to "at least" the two additional factors (e. g., quality and contingency). "The latter two factors give the trial court the needed flexibility to tailor an award to the actual performance of coun-

sel." *Lindy Bros. Builders v. American Radiator*, 382 F.Supp. 999, 1023 (E.D.Pa.1974) (on remand). When discussing the quality factor, the District Court considered three areas: the history and complexity of the antitrust litigation, the quality of the work in the case along with counsel's legal and educational background, and the amount of the recovery. This last factor was considered in keeping with the Third Circuit's mandate. (487 F.2d 161, 168). The court was extremely cautious in declining to base the award on a pure contingent fee percentage basis, yet at the same time it refused to downplay the significance of the amount recovered when calculating the award. This reflected in a footnote which asserts, "of course, after the amount of a fee has been determined, a court may wish to test its reasonableness by computing the percentage of the entire fund awarded as a fee and comparing the result figure with those in similar cases." 382 F.Supp. 999, 1023 n.24.

The District Court recognized that, while the method devised by the Third Circuit deviated from the method (or lack thereof) applied in the past, the same factors were considered critical to the determination of a reasonable fee. The only difference was that an award was to be calculated on the basis of a more thoughtful consideration of each factor. The Third Circuit apparently agreed with the District Court's analysis, and basically affirmed the decision on remand. *Lindy Bros. Builders v. American Radiator*, 540 F.2d 102 (3d Cir. 1976) (*Lindy II*). The Third Circuit reiterated the probative value of the benefits conferred upon the class:

In determining whether to adjust the "lodestar" for quality of work or not, the District Court may consider, *inter alia*,

1) The result obtained by verdict or settlement, evaluated in terms of (a) the potential money damages available to the class member, i. e., a comparison of the extent of possible recovery with the amount of actual verdict or settlement; (b) the benefit—monetary or non-monetary—conferred on the class, i. e., permitting the court "to recognize and reward achievements of a particularly resourceful attorney who secures a substantial benefit for his clients with a minimum of time invested" . . .

2) An evaluation of the professional methods utilized in processing the case,—rewarding the use of efficient methods to expedite the case and penalizing the use of methods the predominant purpose of which was to delay or obstruct the proceedings. *Id.* at 118.

*Lindy I* successfully made the point that reasonable fees should be based primarily on a time-rate analysis. Now *Lindy II* stressed that two important aspects of quality, to wit, extent of benefit conferred and efficient expedient legal work, could and should affect the reasonableness of a fee award even though these may be antithetical to the mechanical time-rate analysis. The *Lindy* court realized that a pure time-rate analysis, although a valid starting point for calculating fees, also had pitfalls and shortcomings. For this reason, adjustments could be made in the award where a great benefit was secured for the class, and/or significant achievements were accomplished in a minimal amount of time. On a pure time-rate analysis these laudatory efforts and results would adversely affect a fee award.

The *Lindy* approach has profoundly affected judicial determinations of fees in the last five years. Although few circuits are bound to follow it, many circuits refer to it along with other considerations. The approach has gained a certain amount of respectability throughout the country because of judicial recognition that percentage-based fees, thoughtlessly calculated, can often result in windfall recoveries to successful class action attorneys. The Second Circuit in *Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974) (*Grinnell I*), stated:

We are not under the illusion that a "just and adequate" fee can necessarily be ascertained by merely multiplying attorney's hours and typical hourly fees. However, we are convinced that this simple mathematical exercise is the only le-

gitimate starting point for analysis. It is only after such a calculation that other, less objective factors, can be introduced into the calculus. *Id.* at 471.

The *Grinnell* court, however, adopted the time-rate analysis more strictly than most, which left it in the unenviable position of having to pose conclusory, unsatisfactory answers to what are real, repeatedly emphasized concerns relating to the lodestar approach.

It may be argued that by minimizing the important role traditionally played by the magnitude of recovery, there will be considerably less incentive for the class attorney, particularly when negotiating a settlement, to seek as high a recovery as possible. Conversely, it can be complained that such a rule will encourage counsel to avoid quick settlement or, indeed, any settlement in hopes of prolonging the proceedings and accumulating billable hours. Although there may be some truth in these arguments, we feel that their impact can be minimized by an intensified scrutiny on the part of the court which must approve each negotiated settlement. *Id.* at 471.

The *Grinnell* court brought considerable focus to some of the problems inherent in a strict time-rate analysis. *Lindy* itself never "minimized the important role traditionally played by the magnitude of recovery;" it merely tried to de-emphasize the use of the contingency fee syndrome, as did Judge Decker in *Illinois v. Harper & Row, supra.* Judge Decker, disparaging the historic contingency fee syndrome, emphasized that reliance upon the amount of recovery, far from being a part of that syndrome, was a positive factor. "Finally, and more important than any of the foregoing, the fee should be measured in relation to the benefits conferred upon the members of the class. There is no better test than this of the efficacy of the services rendered." 55 F.R.D. 221, 224. Not surprisingly, other courts consider benefit conferred as well as time-rate as an important, if not paramount, factor in determining a reasonable fee. *Arenson v. Board of Trade,* 372 F.Supp. 1349, 1358–59 (N.D.Ill.1974); *In re Clark Oil Anti-Trust Litigation,* 422 F.Supp. 503, 511 (E.D.Wis.1977); *Merola v. Atlantic Richfield Co.,* 515 F.2d 165, 172 (3d Cir. 1975); *In re King Resources Securities Litigation,* 420 F.Supp. 610, 630 (D.Colo.1976).

*Lindy* is probably considered the landmark decision in the area of attorneys' fees awarded pursuant to the settlement of a class action, but it is by no means the only approach followed today. The Fifth Circuit devised its own list of factors in *Johnson v. Georgia Highway Express,* 488 F.2d 714 (5th Cir. 1974). The twelve factors cited in that case are 1) the time and labor involved in the litigation, 2) the novelty and difficulty of the issues, 3) the skill requisite to proper performance of legal services, 4) the attorney's inability to take on other cases (for fees) due to acceptance of the class action, 5) customary fee, 6) time limitations imposed by the client or the circumstances, 7) the amount of money involved and results obtained, 8) experience, reputation and ability of the attorneys, 9) undesirability of the case, 10) length and nature of the attorney-client relationship, 11) awards in similar cases, and 12) the existence of a fee agreement. Upon close inspection, it is fair to say that these factors are the same basic considerations mandated by both the *Lindy* analysis, and the Code of Professional Responsibility. The difference is only one of emphasis. A factor apparently absent from the list is the contingent nature of the litigation. Other Fifth Circuit cases have subsequently added it. *See, e. g., Wynn Oil Co. v. Purolator Chemical Corp.,* 391 F.Supp. 522 (M.D.Fla.1974). The Fourth Circuit in *Barber v. Kimbrell's, Inc.,* 577 F.2d 216 (4th Cir. 1978) adopted the *Johnson* approach as well. These circuits use all twelve factors to determine a fee award, starting, however, with an initial time-rate analysis. Still other circuits, notably the Tenth, continue to adhere to a percentage-of-recovery approach to fee awards. *See Seiffer v. Topsy's International, Inc.,* 70 F.R.D. 622 (D.Kan.1976); *In re King Resources Co. Securities Litigation,* 420 F.Supp. 610 (D.Colo.1976).

Many courts also recognize the need in making fee awards to encourage attorneys to bring class actions to vindicate public policy (e. g., the antitrust laws) as well as the specific rights of private individuals. Many opinions give considerable recognition to this argument.[9] The Manual for Complex Litigation, Section 1.47, adopts the standards set forth in the Code of Professional Responsibility (*supra* at 22) and then adds:

> [A]dditional Standards should include a recognition of the following:
>
> 1) That in seeking and accepting employment as counsel for a judicially determined class an element of service is involved; 2) the representation of a class by counsel is not a result of private enterprise but results from judicial determination; and 3) the policy of the law in class actions, including antitrust actions, is to provide a motive to private counsel to represent consumers and to enforce the laws.

The effort here appears to be clearly to recognize the difficult judgment factors in weighing the professional responsibility of a lawyer, not only to his clients, but also to the public and to the court, the public policy to encourage private enforcement of the antitrust laws, and the proper determination of fair fees for attorneys who create a fund benefitting a class.

The Seventh Circuit has no clear formula by which to award fees. Perhaps the most widely recognized opinions from the Circuit were those written in *Liebman v. J.W. Petersen Coal & Oil Co.*, 63 F.R.D. 684 (N.D.Ill. 1974) and *Arenson v. Board of Trade*, 372 F.Supp. 1349 (N.D.Ill.1974). The *Liebman* case adopted the *Lindy* standards, specifically rejecting the idea of awarding a percentage-based fee. Nonetheless, Judge Will goes on to state:

After a determination of what would be a normal fee . . . adjustments should be made upwards or downwards to reflect special considerations such as contingency, complexity, amount of recovery, relative recovery to members of the class, inducement to counsel to serve as private attorneys general, duplication of services, public service considerations, etc. *Id.* at 701.

In *Arenson*, the court awarded fees based on a list of four general factors, each of which contained several subconsiderations. The four primary factors were 1) magnitude and complexity of the litigation, 2) the quality of the services provided, 3) time and labor spent, and 4) the beneficial result achieved.

The other Seventh Circuit District Court cases each relied on different factors in awarding fees, yet most seemed to take *Lindy's* time-rate analysis as the initial step. There have apparently been only two Appellate level decisions to date. *Waters v. Wisconsin Steel Works*, 502 F.2d 1309 (7th Cir. 1974), found that time spent and billing rates are important factors to be considered in awarding attorneys' fees. The Court then proceeded to adopt the considerations set out in the Code of Professional Responsibility, DR2–106, as the proper guidelines to be followed. The only other Appellate level case is *Swanson v. American Consumer Industries, Inc.*, 517 F.2d 555 (7th Cir. 1975). While that case does not set forth specific criteria upon which fee awards are to be based, it did hold that the amount recovered is to be accorded great weight.

> The fact that [the attorneys] failed to prevail on several of the issues they raised is entitled to weight in the determination of the appropriate amount of the fee award, as conversely, an attorney's success on all or most of the important issues in a case would likewise be

**9.** *See, e. g., Arenson v. Board of Trade*, 372 F.Supp. 1349, 1356 (N.D.Ill.1974) ("It must be remembered that the award of attorney's fees in certain cases is necessary to provide an incentive to counsel for the representation of a class"); and *Oppenlander v. Standard Oil Co.*, 64 F.R.D. 597, 614 (D.Colo.1974) ("In awarding counsel fees in successful actions, we recognize that unless competent attorneys are encouraged by adequate awards to undertake representation of this kind, the interests of minority stockholders would often be left without any protection.").

entitled to weight in determining his fee. The amount that an attorney can expect to receive as a fee for prosecuting a case, absent an understanding with the client to the contrary, is necessarily related . . . to the amount actually recovered. It is also related in some degree to the amount that could realistically have been hoped to be recoverable. *Id.* at 563.

It is apparent from the foregoing that the law on attorney fee awards is in a state of flux, and is far from being settled. Opinions vary not only among the Circuits, but within them as well. Arthur R. Miller, professor at the Harvard Law School, has recently completed a study for the Federal Judicial Center pertaining to the state of the law and the attitudes prevalent within both the judiciary and the bar concerning attorneys' fee awards.[10] After an in-depth analysis of both the case law and the results of a survey administered by himself and some law students, Miller concluded that, although certain trends can be ascertained at this time, there is still no general consensus on the proper method by which court awarded fees are to be determined:

> By and large, these questions have not yet been answered in a systematic way within each circuit, although some circuits have broad guidelines for handling some of them. The case law and survey responses show that fee awards still lie very much within the discretion of the judge, and he or she is free to a large extent to develop specific methods of dealing with broad standards announced at the Court of Appeals level. Miller, *supra*, at Ch. III, p. 1.

As a broad proposition, Miller maintains that the *Lindy* lodestar approach has gained varying degrees of acceptance within the courts, although application of the *Lindy* guidelines has been fairly inconsistent. *Id.* He also concludes that class recovery is still an important factor in fee award determinations, although the way in which this factor is utilized varies from court to court.

While some courts continue to award the fee based on a percentage of the total recovery, others use it to adjust the lodestar figure or to establish the proper hourly rate. Anyone familiar with these problems agrees that the law is in a state of murky evolution. What is needed is a comprehensive statement of guidelines concerning reasonable, fair, and just fee awards so that future courts may achieve a certain degree of consistency in making these awards.

An early, and still the leading law review article on the topic of attorneys' fee awards in the context of class actions was written by George D. Hornstein. It was written during a period when awards in class action cases were made on a contingent or percentage-of-recovery basis. Hornstein was a strong advocate of this system, because he maintained that too much emphasis on an hours-spent analysis would create an atmosphere of wasted time and limited imagination in the conduct of such litigation.

> The lawyer on a contingency . . . may expend considerable time urging highly meritorious issues and yet end up with no fee if he does not confer a financial benefit. Where success is a condition precedent to compensation, "hours of time expended" is a nebulous, highly variable standard, of limited significance. One thousand plodding hours may be far less productive than one imaginative, brilliant hour. G. Hornstein, *Legal Therapeutics: The Salvage Factor in Counsel Fee Awards*, 69 Harv.L.Rev. 658, 660 (1956).

He recognized that a major fallacy in awarding fees on an hours-spent basis was that it promoted inefficiency in the plaintiffs' bar.

> Another factor to be borne in mind is that when hours become a criterion, economy of time may cease to be a virtue. Inexperience, inefficiency, even incompetence will be rewarded. Expeditious termination of litigation will be discouraged—to the great cost of all concerned, including the state. *Id.* at 660–61.

---

**10.** Miller, Arthur A., "Attorneys' Fees in Class Actions: A Study Prepared for the Federal Judicial Center" (July, 1979).

This same concern was expressed in *Lindy Bros. Builders v. American Radiator*, 540 F.2d 102 (3d Cir. 1975) (*Lindy II*), when it permitted a multiplier to be awarded based in part on class counsels' efficient use of time, even though that factor undoubtedly served to diminish the number of hours for which compensation would be forthcoming.

> [Counsel was] aggressive and imaginative throughout. Because the work has been efficient and of an atypical quality, the aggregate hourly compensation should be increased . . . Certainly, economy of effort should not be penalized. Less experienced and less skillful attorneys would undoubtedly have expanded [sic] much more time in achieving the same result than did petitioners. *Id.* at 114.

*See also Blank v. Talley Industries*, 390 F.Supp. 1, 5 (S.D.N.Y.1975).

The author of the most comprehensive treatise on class actions to date demonstrated the inherent unfairness in the time-spent lodestar analysis which serves to undermine the tremendous significance of benefits conferred upon a class.

> Ironically, the fewer the legal hours spent in reaching a successful disposition of a case on behalf of a class, the higher would ordinarily be the evaluation of the services rendered. Obviously, if counsel is able to reach a certain result for the class in half the time it might take some other counsel to reach the same result, the first counsel should be commended, not penalized, for showing more expertise and litigation efficiencies. 3 Newberg, *Class Actions* 1149–50 (1976).

Newberg's solution to such a dichotomy is not to dispose of the lodestar analysis in determining an appropriate fee award, but merely to view the hours spent in a more meaningful light.

> Perhaps a better use of data on legal time actually spent would be to compare that figure with the total hours that might normally have been required to adjudicate the controversy to a similar conclusion, and then to evaluate counsel's performance by how much litigation time and expense was avoided because of the

ingenuity and expertise in negotiating, for example, a favorable class settlement. *Id.*

Finally, an important consideration invariably advanced by commentators in this area is that an incentive premium is a necessary factor to provide skilled and reputable attorneys with the inducement to continue prosecuting these actions in the future.

> Nor should the incentive factor of tying fees to results accomplished be underrated in importance. An additional allowance for the successful result achieved, serves to maximize the recovery for the class and promote the effective enforcement of important Congressional policies embodied in laws of national importance. With knowledge that the result achieved will be a major measure of the fee allowed, the class attorney will accept only the best results possible. 3 Newberg, *supra* at 1197.

The incentive factor appears to be recognized in the Manual for Complex Litigation § 1.47 *infra*, which states that awards should be made in consideration of

> the policy of the law in class actions, including antitrust class actions, [which is] to provide a motive to private counsel to represent consumers and to enforce the laws.

During the District Judges conference of 1974, this section of the Manual was approved and adopted by the attending judicial body. 64 F.R.D. 225, 281–82 (1974). The practical applicability of this theme to the *Folding Carton Antitrust Litigation* was succinctly illustrated by Mr. Harold Kohn, in his statement at the meeting of August 28, 1979:

> [There] was a feeling at the end of this case: What in the world are we knocking ourselves out for when we got to the last 3, 4, 5 to get an extra 35, 40 or 50 million, unless there is a feeling that entering into the final award of fees will be some consideration for the amount of money received, not that you do it on a flat percentage or anything else.

People are simply not going to kill themselves at the tail end of the race . . . . In other words, if you get as much of a fee for a $100 million settlement as a $200 million settlement and both are magnificent and both are extraordinary and so on, why be a hero and go through what we went through at the end of this case? I mean, we could have retired with glory. Instead, we were in there annoying everybody with petitions to hold people in contempt for failing to testify. Transcript, August 28, 1979, pp. 93–94.

D. *Standards Adopted by the Fee Committee and Recommended to This Court.*

After review of the law and commentaries, reading of all the petitions in this case and the thoughtful presentations at the meeting of August 28, 1979, the endless hours of discussion by the Committee concerning the standards to be applied and the effect of those standards on each lawyer and paralegal in this case, the Committee is struck by the difficulty of the task. It is not sensible to be guided only, or even substantially, by pure mathematical formulas. Most importantly, the fees ultimately granted by this Court must be fair—fair to the class members, and to the lawyers involved, and perceived as fair to the informed public as well as to all of the participating plaintiffs' attorneys in this litigation. The fact that fairness is such an elusive quality should not be a deterrent but rather a reminder that the problem cannot be solved by mathematics alone, but a solution is only possible by the application of a large measure of common sense, sound judgment, and experience.

The Committee is reminded of the opening paragraph of *The Common Law* by Oliver Wendell Holmes, Jr.:

The object of this book is to present a general view of the Common Law. To accomplish the task, other tools are needed besides logic. It is something to show that the consistency of a system requires a particular result, but it is not all. The life of the law has not been logic: it has been experience. The felt necessities of the time, the prevalent moral and political theories, intuitions of public policy, avowed or unconscious, even the prejudices which judges share with their fellow-men, have had a good deal more to do than the syllogism in determining the rules by which men should be governed. The law embodies the story of a nation's development through many centuries, and it cannot be dealt with as if it contained only the axioms and corollaries of a book of mathematics. In order to know what it is, we must know what it has been, and what it tends to become. O.W. Holmes, Jr., *The Common Law*, pp. 1–2 (Little, Brown & Company, 1881).

As with so many problems, it is not possible to deal with the fees to be awarded by this Court as if the resolution "contained only the axioms and corollaries of a book of mathematics." As Holmes said at the beginning, "It is something to show that the consistency of a system requires a particular result, but it is not all. The life of the law has not been logic: it has been experience." The Committee has been determined to show consistency and, where possible, to explain by mathematics, the results obtained, but it has also been determined to preserve the life of the accomplishment in this litigation and it has used whatever common sense, judgment and experience it has to achieve that result in its recommendation to this Court. Finally, the Committee has tried to remain aware of what the law has been with the knowledge that what this Committee does may have a positive and recognizable effect on what the law in this area is tending to become.

Based on all of the foregoing, the Committee determined that an initial time-rate inquiry was an appropriate starting place utilizing daily time sheets and fair and sensible hourly rates in the context of the work done and the nature of the litigation. Nonetheless, an ultimate recommendation as to fees requires careful consideration of other factors which the Committee analyzed under four separate categories or headings:

—the contingent nature of class action litigation.

—the quality of legal services provided to the class in the litigation.

—the benefits conferred on the class by the results of the litigation.

—the public service aspect of this type of litigation.

1. *The Time-Rate Analysis.*

The Committee believes that the time-rate analysis is a proper beginning step for the determination of attorney fees.

a) *The Hours Worked*:

Plaintiffs' work was widely and specifically distributed through the Executive and working committees established early in the case and described in Exhibit 5. The organization of plaintiffs' case was effectively and efficiently managed by the Executive Committee. In reviewing hours the Committee was impressed with the overall quality of the time records which were kept and the lack of excessive or duplicated hours in carrying out the tasks required.

All but two petitioners submitted daily time sheets for review by the Committee. For the two petitioners not submitting daily time sheets, one firm submitted complete computer printed weekly summaries, and one firm submitted similar monthly summaries. The time sheets were reviewed in depth and where problems were perceived, discussed by the Committee. In its review of time the Committee looked for or discovered questions in the following areas:

(1) *Duplicated Hours*: Duplication of work was considered by the Committee to occur either where attorneys in the same firm did the same work, or attorneys in different firms duplicated the same tasks. The Committee found only a few hours that could be called "duplicated," but where such duplication clearly appeared in the time sheets, the duplicated time was deducted from the hours requested.

(2) *Hours not Spent for the Benefit of Plaintiff Class*: Some attorneys spent time reading and reviewing many of the motions and briefs that came into their offices regarding the case. General "read and review" time was disallowed unless attorneys had specific responsibility for reading particular documents. Time was allowed for reading all Pretrial Orders and all plaintiffs' newsletters.

In addition, where it was judged that specific hours were spent only for the benefit of an individual plaintiff and not for the benefit of the class, the hours so spent were deducted from the requested hours. The Committee found only a few hours in this latter category.

Time spent in preparing fee petitions or monthly time summaries was disallowed.

Some petitions showed a great amount of time by paralegals or law clerks for filing documents received in the case. Where the filing time was extensive, the Committee deducted the time from the hours requested.

(3) *Reasonableness of Time Claimed*: The Committee also considered the reasonableness of the time claimed to do specific jobs. In certain instances where the Committee in its own experience and judgment determined that a reasonably careful lawyer would not have spent the time which was shown to do or complete a particular task, the Committee deducted from the hours claimed the number of hours it judged excessive. Wherever possible within the time available to the Committee, the attorneys have been consulted and specifically advised of the deductions.

b) *Hourly Rates*:

The Code of Professional Responsibility DR2–106(B)(3) refers to the "fee customarily charged in the locality for similar legal services." In a nationwide class action such as this, it is difficult to evaluate the differing hourly rates requested by attorneys from across the country. The fees in New York or Philadelphia may differ from those in Chicago, Houston, Minneapolis or San Francisco. The Committee believes that a proper hourly rate structure for a national class action would reflect rates prevalent

for attorneys in the Chicago Metropolitan Area. The Committee determined that a fair and reasonable rate for leading trial attorneys in Chicago was $150 based upon the rates requested by some of the leading attorneys in this case, the rates actually charged by leading defense firms,[11] and the best judgment of the Committee of what would be a fair hourly rate for leading lawyers in this type of litigation in Chicago.

The Committee is mindful, too, of the public service quality of class action litigation. Wealthy private clients may by their own choosing pay slightly higher hourly rates than a court may be prepared to award court approved class action attorneys. In other words, a fair hourly rate in class action litigation might be slightly lower than the rate an attorney might charge a wealthy private client for similar litigation.

The Committee also believes that the hourly rate should reflect the leadership and responsibility role of a particular attorney in particular litigation. To put the problem more directly, the Committee believes it helpful to view the problem somewhat like one would view a law firm. It is possible, but unusual, for the lead counsel in litigation to receive a smaller hourly rate than a member of the litigation team. On the other hand, it is quite possible for attorneys who are skilled but not in leadership roles to receive hourly rates similar to those who do exercise leadership roles.

With the above considerations in mind the Committee adopted the following standards concerning hourly rates to be recommended to the Court in this litigation:

a. The maximum hourly rate for any attorney in this litigation should be the maximum fair hourly rate *prevalent* in the Chicago Metropolitan Area for attorneys of similar skill and stature.

b. A maximum hourly rate for attorneys in this litigation should be $150 per hour

and this rate should be reserved primarily for attorneys serving as members of the Executive Committee in light of their special responsibilities or for those senior attorneys who made particularly significant contributions to the litigation.

c. A maximum hourly rate for Committee Chairmen and other middle and senior partners who made significant contributions to this litigation should be $125.

d. A maximum hourly rate for associates should be $75.

### 2. Other Factors:

The most difficult part of the Committee's work was to evaluate and try to clearly enunciate the other factors which might go into the determination of a total fee award. It is at this point in most judicial opinions that the analysis breaks down. *Lindy I*[12] described these factors as the "contingency" and "quality" factors. Contingency included "risk" and "delay in payment," and quality included "extent of benefit conferred" and "efficient, expedient legal work." The Code of Professional Responsibility lists other factors such as the novelty and difficulty of the questions involved, the skill needed to perform the services properly, the amount involved and the results obtained, time limitations, the experience, reputation and ability of the attorneys, whether the fee is fixed or contingent, and whether particular employment will preclude other employment.

The Committee determined that "other factors" could be thoroughly presented and analyzed under four headings, namely, (a) the contingent nature of class action litigation, (b) the quality of legal services in the litigation, (c) the benefits conferred upon the class, and (d) the public service aspect of this type of litigation.

---

11. Private inquiries indicate that rates in Chicago vary significantly but that $150 per hour is a top rate for many leading trial attorneys. It is also true that a few unusually skilled and nationally known attorneys may receive in some matters up to $250 per hour, but that level is quite rare in Chicago.

12. *Lindy Bros. Builders v. American Radiator*, 487 F.2d 161 (3d Cir. 1973) (*Lindy I*).

### a) Contingent Nature of Class Action Litigation :

If a fund is created, it is proper to pay attorneys out of the fund that they helped create. If no fund is created, usually no payment is made. By its nature, the class action delays the payment of fees until either a settlement or a final judgment after trial is reached. Pending those two events, attorneys invest large amounts of time and they or their clients pay substantial out-of-pocket expenses. The question is valuing the delay in payment from the time of the doing of work and the payment of expenses until the time payment is to be made.

Traditional economic theory would use an interest rate or rate of return type of calculation with the rate to be determined by the degree of risk inherent in the investment. Surely the risk here is greater than the rate received on "safe" investments like treasury bills or corporate paper which have been at approximately ten (10%) percent in recent years. Successful results in litigation cannot be guaranteed, time of payment is never certain, and the investment of time and money continues to increase as time passes. To assess risk in this type of undertaking is extremely difficult. Analysis, however, should be attempted.

(1) First, there are the risks of litigation generally. The "best" case can be lost and the "worst" case can be won. Trial delays, loss of witnesses, unfavorable developments in the law, inability to develop evidence, and trial error risking reversal are real possibilities in every case. In the instant litigation, such risks were not great except for the Fifth Amendment claims by witnesses, and the *Illinois Brick* decision and the attempted legislation that followed that decision. *Illinois Brick* itself necessitated a modification in the previous certification, affecting 5–6% of the class members; the proposed legislation would have enormously confused the class issues and vitiated the settlements.

(2) Second, there are risks that a jury or court will find either no or limited jurisdiction or no liability. Because of prior government criminal proceedings, such a result here was minimal except in two respects: (a) certification of a class involving a nationwide conspiracy was a challenging and difficult undertaking, and (b) proof of a conspiracy was extremely difficult to obtain because of the defendants attempted massive utilization of Fifth Amendment protections. Nonetheless, it can also be said that prior criminal proceedings are generally narrower in scope than any civil action and helpful, from a discovery viewpoint, only in the beginning. Where all or most of the defendants plead *nolo* soon after indictments have been handed down, government evidence gathering comes to a halt and the civil plaintiffs must do considerable discovery work on their own.

(3) Third, there are risks in establishing and proving a viable theory of damages. That was a real risk in this litigation. In retrospect, the problem appears to have been simply resolved by the "on the phone, off the phone" theory of damages. Nonetheless, the varying markets and products made the problem an extremely challenging one. Many a jury has found liability with no or minimal damages. A related risk is that a jury, after finding liability, will not be able to accurately assess the full extent of damages due to the complexities and the sheer numbers involved in a class action of this sort. The instant litigation was susceptible to this type of problem had the case proceeded to trial.

(4) Fourth, individual lawyers by their greater commitment of time and money to a case assume a greater risk. A massive effort such as class action antitrust litigation can result in producing nothing more than a dry or only slightly damp hole. Those who have invested more in time and people certainly have more to lose, or, conversely, more to gain. The Committee feels that the risk at this juncture can be individualized somewhat between those who assume greater and lesser responsibility. It can also be individualized between partners and associates, the former in most instances obviously risking more than the latter.

In the instant litigation the Committee determined that there was some risk for all of the above factors, minimal in (1) and (2) but more substantial in (3) and in (4) depending on the lawyer involved. In order to assist it in assessing the risk factor the Committee consulted with Professor Robert E. Lucas, Jr., of the Department of Economics at the University of Chicago. It was Professor Lucas' opinion that a 20% annual interest rate would be a conservative return on an investment of this kind. Such a return "reflects certainly not excessively, the risky character of the investment in committing funds to an enterprise with so open an outcome." *Lucas Report*, Exhibit 4, p. 4. With total costs of $7 million (the approximate costs in hours and expenses for attorneys in this litigation to date) expended equally over 40 months the actual direct costs applying the 20% figure are 1.42 × $7 million or $9.9 million as of the date of the fee award. The Committee agrees that this is probably a conservative figure.

As to the inflation factor, the Committee recommends that it is best handled by adopting a current hourly rate for all hours worked in the litigation. This recommendation conforms with the recommendation in the study of Professor Arthur Miller, Chapter 7, p. 22. The alternative of applying rates in effect at the time the work was performed and then adjusting for inflation is more time-consuming and more difficult to determine. The current hourly rate approach may not be appropriate, however, in circumstances different from those present here where the litigation stretches on for many years.

b) *Skill and Ingenuity of Counsel* :

This particular aspect of any class action is elusive and conceptually difficult to evaluate. Where a considerable number of in court proceedings have transpired prior to the resolution of a case by settlement or judgment, judicial determination of the quality of skill exhibited by plaintiffs' counsel is facilitated. Where such is not the case, the quality of expertise must be analyzed by resort to a deductive, rather than inductive reasoning process, by critically analyzing the results achieved in view of all the facts and circumstances brought to a court's attention. Because of the mechanics and the make-up of the Fee Committee to this litigation, both of these processes may be invoked to assess the degree of skill and expertise of class counsel. The members of the Committee who participated in the litigation have first-hand knowledge of the skill employed by the various attorneys. Due to both their positions as lead counsel in the case, and to the liaisons between the Executive Committee and the other working committees which were maintained throughout, they were able to observe the manner in which the attorneys carried out their assigned tasks. Although major tactical decisions were made at the executive level, input was forthcoming from every echelon of the litigation structure. Moreover, on the occasions when various attorneys were asked to pursue litigation strategies over and above the "call of duty," the manner in which these tasks were carried out was visible to the participating members of the Committee.

The Committee is of the opinion that by and large counsel worked expeditiously and efficiently in this litigation, and did not pursue unassigned avenues or strategies. There were some instances where certain efforts were unnecessarily duplicated or where counsel undertook work primarily to benefit a private client and not the class (*i. e.*, reviewing all developments in the case). These circumstances, in most instances, were brought to the attention of the Executive Committee and corrected. The Committee determined that duplication, inefficiency and/or poor judgment were the exceptions in this litigation. Where applicable, the Committee considered these factors when making its fee recommendations. Basically, however, the Committee considered the overall excellent ability and performance of plaintiffs' lawyers when making its recommendation.

The deductive approach was employed by all members of this Committee. By observing the entire conduct of the litigation ret-

rospectively, the Committee was able to determine with a fair degree of accuracy the nature and quality of the services rendered in this case. By this process, the following observations were made by the Committee.

1) The background of all counsel was ascertained. Where counsel had been involved in class action litigation in the past, a presumption arose that such experience had more likely than not allowed those attorneys to exhibit a fair degree of skill in this litigation. Moreover, where counsel have had lead positions in prior multidistrict litigation, it could fairly be inferred that because of their previous lead positions, they had higher organizational and efficiency capabilities than the average attorney.

2) The number of the total hours spent in this litigation was evaluated. The many hours could have been indicative of poorly organized, inefficient, unimaginative work, or it could have reflected an unusually massive, complex lawsuit handled skillfully and with imagination. The Committee thoroughly analyzed the history of this case and in so doing, observed the great number of defendants and class members, the pretrial orders, the various appeals taken, the roadblocks encountered in the discovery program, and the novelty of a number of the legal issues. It then determined that for the most part the number of hours actually spent was necessary, and probably small, in relationship to the result achieved in this case. There were some instances of unnecessary hours spent, and where this was brought to light, the Committee downgraded skill as a factor to be considered when making a particular fee recommendation. Generally, however, the number of hours spent was thought to highlight the complexity and massiveness of this litigation, which required a high degree of skill to move along.

3) The Committee considered the skill and determination of defense counsel in this case. The fact that these attorneys were highly skilled and spared no expense in defending this action gave some evidence of the skill required and in the Committee's judgment employed by plaintiffs' counsel in meeting the defense in this litigation.

4) The Committee believes that the number of hours spent on this litigation reflected overall a high degree of skill employed by the attorneys for the plaintiff class. Counsel achieved their end result in less hours than might be required of less imaginative, less resourceful, less efficient attorneys. The Committee commends counsel for such skill and has tried to reflect that recognition in its final fee recommendations.

5) The Committee took notice of the fact that the time-rate analysis which it adopted as a starting point in its determination of appropriate and reasonable fees did not fully reflect the quality of work exhibited in this litigation. Individual billing rates of attorneys reflect to a degree unusual skill and expertise. Nonetheless, these rates were reduced in many instances herein in order to achieve consistency and to cure blatant discrepancies. In addition, where unusual skill was exhibited in this litigation by attorneys at whatever level, that factor was considered by the Committee.

c) *The Benefits Conferred Upon the Class*:

The Committee recommends that important consideration be accorded to the results achieved in this litigation. There are two aspects of the benefit factor which tend to overlap. First, it is the opinion of the Committee that there are very few factors which more aptly reflect the quality of work performed than a highly favorable settlement achieved for the benefit of a class. Second, there are several public policy reasons for giving prime consideration to the recovery secured when arriving at a fair, just, and reasonable award of attorneys' fees. Both of these aspects will be discussed below.

The recovery achieved in this matter represents the highest recovery ever achieved in a class action as of the date it was consummated. The fund approximates

118% of single damages and as such is unprecedented (see pp. 253, 254 supra). The size of the settlements does not imply, however, that little risk was assumed by class counsel in pursuing this litigation. Defendants in these actions will often settle even for large dollars for pragmatic reasons, rather than risk potential trebled damages, where estimated damages themselves are apparently high. *Seiffers v. Topsy's International, Inc.*, 70 F.R.D. 662 (D.Kan.1976). The Committee believes that the proper standard to evaluate a class action settlement is to compare the recovery to single as opposed to treble estimated damages. *Detroit v. Grinnell & Co.*, 495 F.2d 448, 459 (2d Cir. 1974). In view of this consideration, counsel in this litigation could not possibly have achieved a more beneficial recovery for the class.

The Committee believes it important to reflect the benefit conferred factor in the fees to be awarded by the Court in order to assure that counsel will actively and vigorously strive to secure the best possible recovery for the class. In this litigation, defendants offered compromise after compromise, in the hope that plaintiffs' counsel would eventually capitulate to avoid expending further energies and taking further risks. When settlement offers reached 50 to 60% of single damages, counsel had solid grounds backed by legal precedent and economic realities to argue that such an offer be accepted. One hundred million dollars would have been a substantial benefit to the class. Class counsel, however, chose to continue the battle until they secured what they considered to be a full and satisfactory settlement. The Committee treated the outstanding results achieved as an important factor in its fee recommendations.

In assessing this factor the Committee was again aided by the Report received from Professor Lucas (Exhibit 4). Professor Lucas was able to analyze the incentive factor by resort to a working economic model applicable to litigation of this type. By scaling the varying degrees of success

achievable in a class action, and factoring in the quality (zero, minimum, average, maximum) of possible recoveries, Professor Lucas calculated what he felt was a reasonable fee based on an incentive factor to be paid attorneys in this case. Lucas determined that a straight-line incentive factor accruing to the lawyer, is critical to recovery of an optimal sum in any given case. Maximum amounts can be achieved by allowing remuneration to depend in a quantitative degree on the amount of recovery accruing to the class. After utilizing the variables extant in the Folding Carton Litigation, Professor Lucas concluded that an incentive factor of 4.5% or 4.5 cents on every dollar over and above actual costs was a conservative incentive to pay lawyers in this litigation. Table I of the Lucas Report, Exhibit 4, p. 3, is as follows:

TABLE I

| Settlement ($ Millions) | Fee ($ Millions) |
| --- | --- |
| 30 | 9.9 |
| 80 | 12.1 |
| 130 | 14.4 |
| 200 | 17.6 |

d) *Public Policy Considerations*:

Finally, the Committee has considered several public policy considerations. On the one hand, Congress has indicated that private enforcement of the antitrust laws is to be encouraged. Experienced and capable counsel are needed to work in this area. On the other hand, the Courts and the public must be watchful to insure that fees awarded successful counsel are not so large as to call into question the integrity or reputation of the legal profession. There are many lawyers of talent who could and should be attracted into this practice. Finally, as set forth in the Manual for Complex Litigation, Section 1.47, there is an element of public service involved in serving as counsel for a judicially determined class. The Committee believes that the class action mechanism is one of the most viable means of insuring that the policy behind the antitrust laws will continue to be advanced. To this end, we have endeav-

ored to recommend a framework for analysis of attorney fee awards in class action antitrust matters which meets the highest standards of fairness and reasonableness.

e) *The Specific Recommendations for Attorneys in This Litigation* :

Based on the foregoing, the Committee respectfully submits a recommended fee award for each petitioner herein. The second volume of this Report contains an individual recommendation for each petitioner setting forth the specific recommended hours, rates and values for each attorney and explaining in some detail the reasons for each recommendation.

## CONCLUSION

The Committee respectfully submits this Report and its recommendations for the Court's consideration.

FOLDING CARTON FEE
COMMITTEE

_____

Thomas J. Boodell, Jr.

_____

Perry Goldberg

_____

James B. Sloan

## EXHIBIT NO. 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Name of Presiding Judge, Honorable ___ROBSON AND WIL___

Cause No. __MDL 250__                  Date __June 29, 1979__

Title of Cause      __IN RE FOLDING CARTON ANTITRUST LITIGATION__

Brief Statement
of Motion           _____

                    _____

                    _____

The rules of this court require counsel to furnish the names of all parties entitled to notice of the entry of an order and the names and addresses of their attorneys. Please do this immediately below (separate lists may be appended).

Names and           _____
Addresses of
moving counsel      _____

Representing        _____

                    _____

Names and           _____
Addresses of
other counsel       _____
entitled to
notice and names    _____
of parties they
represent.          _____

                    _____

                    _____

Reserve space below for notations by minute clerk

A committee of three attorneys is hereby appointed to review the fee petitions submitted by attorneys for the class plaintiffs. The attorneys appointed are Perry Goldberg, James Sloan, and Thomas Boodell, Jr.

EXHIBIT NO. 2
FOLDING CARTONS FEE COMMITTEE
July 5, 1979
TO: ALL PLAINTIFFS' COUNSEL
Re: Folding Carton Antitrust Litigation—MDL 250

By order of Judges Robson and Will dated June 29, 1979, Perry Goldberg, James Sloan and Thomas J. Boodell, Jr. were appointed a committee of three "to review the fee petitions submitted by attorneys for the class plaintiffs." Messrs. Goldberg and Sloan are already familiar to you. Mr. Boodell is a Chicago attorney whose address is:

Thomas J. Boodell, Jr.
Boodell, Sears, Sugrue, Giambalvo & Crowley
One IBM Plaza-Suite 2650
Chicago, Illinois 60611
312–222–9400

We are writing this letter to assist you in preparing your petitions for fees and expenses. As you know, the petitions are due to be filed on or before July 20, 1979.

The Committee has contacted Judges Robson and Will to obtain instructions on the format of the petitions and we have received their suggestions. We have read this letter to both judges and it meets with their general approval.

Counsel are encouraged to be as thorough and detailed as possible and are reminded of the Court's frequent comments in this case concerning time records and attorneys' fees.

For a discussion of the general standards, counsel's attention is directed to the cases of *In Re Equity Funding Corp. of America*, 438 F.Supp. 1303 (1977); *Grunin v. International House of Pancakes*, 513 F.2d 114 (8th Cir. 1975); *City of Detroit v. Grinnell Corporation*, 495 F.2d 448 (2d Cir. 1974); *Lindy Bros. Builders, Inc. v. American Radiator and Standard Sanitary Corporation*, 487 F.2d 161 (3d Cir. 1973); *Liebman v. Petersen Coal & Oil Co.*, 63 F.R.D. 684 (N.D.Ill. 1974); *Manual for Complex Litigation* and the *Code of Professional Responsibility of the American Bar Association* § DR 2–106. The Court has approved the following format for the petitions for fees and expenses:

1. A description of petitioner's clients including the approximate size of each client's purchases of folding cartons.

2. Any fee agreements either written or oral which counsel has with his clients. If any fees have already been received by counsel from his clients for work on any aspect of this case, please state the amount, the time spent, and the exact services for which the fees were received. Copies of written fee contracts should be submitted with the petitions. Full recitations of any oral agreements should be set forth in the petitions.

3. Complete copies of any written fee arrangement, or a recitation in full of any oral agreement, by and between any counsel or group of counsel in this litigation should be submitted with the petitions.

4. An itemized statement, with full supporting documentation, (e. g. invoices, expense vouchers, canceled checks, etc.) of the

out of pocket disbursements should be submitted as part of the fee petition.

5. The petition should consist in the first part of a resume of the background and qualifications of each attorney and paralegal for whom compensation is requested. A narrative summary of the general contributions made by petitioning firm should be included as well as a summary of the work of each attorney and paralegal in the firm. The petition should identify each claimant's role in the litigation and committees on which attorneys have served in this case.

6. The petition should be accompanied by complete copies of all daily time records kept by counsel in MDL 250 for which fees are sought. If counsel desires, all time records may be filed under seal with the Court with the understanding that such filings will be available to this Committee and such other persons as the Court may from time to time designate.

7. The petition should contain: a) a summary of the total hours for each attorney and paralegal and the total hours for which compensation is requested.

b) a statement of the applicable hourly rates for each attorney and paralegal during the pendency of this case.

c) a calculation of the total compensation requested by your firm for each attorney and paralegal at the applicable hourly rates.

d) a statement of the increment or multiplier, if any, which petitioners' request.

e) a statement of the total amount requested for each attorney and paralegal when the multiplier or increment is factored in.

f) an explanation and justification for any multiplier requested.

8. The petition should cover the period from the beginning of the case until July 15.

9. Also include to the extent available, a summary of fee applications and time records in other contingency cases handled by petitioners since January 1, 1976. The summary should include the total amount of fees requested, the total hours involved, hourly rate, time multiplier requested, and the actual fees awarded by the Court.

The Committee's first task will consist of a review of each petition in a general way between July 20 and July 27 so as to provide a recommendation to the Court on the total dollar amount to be included in the portion of the notice informing the class of the amount of possible fees and expenses. Since the notice is to be mailed on or about August 1, 1979, there is very little time to complete this first phase of the Committee's work. Subsequent to the completion of the notice, the Committee will thoroughly review each petition and will undertake to confer personally with each petitioner in order to make a responsible report to the Court prior to the September final hearing on fees and expenses. No member of the Committee will participate in the review or recommendations of his firm's fees or expenses.

*FILING INSTRUCTIONS*: The original and two copies should be filed with the Clerk of the Court as follows:

Clerk of the United States District Court
219 South Dearborn Street—20th Floor—
Chicago, Illinois 60604
Attention: Ms. Jan Mintz

Any documents to be filed under seal please put in separate envelope and mark envelope on both sides: "In Re Folding Carton Antitrust Litigation MDL 250—Filed under seal—not to be opened except pursuant to Court Order."

One copy should be sent to each of the following members of the Fee Committee:

Thomas J. Boodell, Jr.
Boodell, Sears, Sugrue, Giambalvo & Crowley
One IBM Plaza-Suite 2650
Chicago, Illinois 60611

Perry Goldberg
Specks & Goldberg, Ltd.
180 North LaSalle Street-Suite 2316
Chicago, Illinois 60601

James B. Sloan
Sloan and Connelly, P.C.
111 West Washington Street-Suite 2104
Chicago, Illinois 60602

The Committee understands that the procedure adopted by the Court in this case in establishing a Review Committee is intended both for the benefit of the Court and for the benefit of plaintiffs' counsel. The Committee therefore earnestly invites whatever suggestions or ideas each of you might have. Please send any such suggestions to each member of the Committee with copies to each Judge as soon as possible.

Fee Committee

By: /s/ Thomas J. Boodell, Jr.

    Thomas J. Boodell, Jr.

    Perry Goldberg

    James B. Sloan

cc:  Honorable Edwin A. Robson

     Honorable Hubert L. Will

EXHIBIT NO. 3

LAW OFFICES

BOODELL, SEARS, SUGRUE, GIAMBALVO & CROWLEY

ONE IBM PLAZA

CHICAGO, ILLINOIS 60611

(312) 222–9400

July 31, 1979

PLEASE REFER TO NO.

TO:     ALL PLAINTIFF'S ATTORNEYS
FROM:  FEE COMMITTEE
RE:     Fee Committee Procedures

We will send by separate mail later this week a summary of all fee petitions filed to date in the Folding Carton Antitrust Litigation. If anybody has any comments or suggestions concerning the summary, please communicate with the Fee Committee.

The Fee Committee during August will review each petition individually. If any additional documentation or information is needed on individual petitions, we will advise the particular attorney.

We have set August 28 as a day for a meeting in Chicago with the Fee Committee and all attorneys who have filed petitions who wish to be heard both on their own fee petitions and generally. The meeting will be at the U.S. Court House in Chicago starting at 9:00 a. m. We will advise you of the exact room prior to the hearing. We will also schedule further meetings with those attorneys who wish to speak to us. In this manner, every attorney filing a petition will have a full opportunity to be heard by the Fee Committee prior to the report of the Committee to the Court.

The Fee Committee will file its report with the Court by September 10, 1979 so that the Court may review it prior to the hearings scheduled on September 13. If anybody has any questions regarding these procedures or other matters, please communicate with the Fee Committee.

Very truly yours,
FOLDING CARTON FEE COMMITTEE
Thomas J. Boodell, Jr.
Perry Goldberg
James Sloan

TJBJ:lm

THE UNIVERSITY OF CHICAGO
DEPARTMENT OF ECONOMICS
1126 East 59th Street
Chicago, Illinois 60637

September 6, 1979

TO: Fee Committee of Folding Carton Anti-Trust Litigation

FROM: Robert E. Lucas, Jr.

I have been asked by the committee to advise on the setting of legal fees in the Folding Carton Anti-trust Litigation. I will first outline the general economic principles which bear on the setting of fee schedules, next apply these principles to a simple illustrative example, and finally discuss some elements which would be involved in a more refined analysis. The main emphasis will be on the *incentive effects* of different methods of setting fees.

At the time an anti-trust suit is undertaken there are, from the clients' point of view, two quite different sources of uncertainty. First, since it is impossible to know in advance the nature of the evidence to be discovered, the final settlement cannot be predicted even *given* the quality of the legal services rendered. Second, the client is uncertain as to what quality of legal effort will be applied to the case, *given* the nature of the evidence. Notice that there is no practical way for the client to separate these two sources of uncertainty even after the fact: a disappointing settlement may be due either to weaker-than-expected evidence or to mediocre legal work. The client has no way of knowing, and the question is nearly as difficult for some one with legal expertise.

These considerations suggest two quite different principles for establishing fees. First, fees must be high enough *on average* so that cases worth pursuing (from clients' viewpoint) are worth undertaking by legal firms with the competence to do so. Second, fees must vary with the size of the settlement in such a way that the responsible firms have the incentive to obtain the best possible settlement, given the nature of the case. It is clear that if the generally accepted schedule of fees should "flatten out" above some given settlement size, no firm would have any financial incentive to work toward any larger settlement, *however strong* be the facts of the case.

These two principles are not sufficient in themselves to determine the "shape" of the appropriate fee schedule, but in conjunction with other information, they are very helpful. An example will illustrate this.

Consider a hypothetical case which will cost \$C to carry to completion, and which has four possible settlement possibilities $0$, $S_{min}$, $S_{ave}$ and $S_{max}$, increasing in size. Think of $0$ as arising when the case comes to nothing, $S_{min}$ as arising when the case is weak but successful and competently handled, $S_{ave}$ as an "average" settlement arising either from a strong case competently handled or a weak one exceptionally well handled, and $S_{max}$ as requiring both a strong case and exceptional handling. Treat all outcomes as equally likely, before the case is undertaken, so that each occurs .25 of the time. The way the case is treated will then depend on the fees $0$, $F_{min}$, $F_{ave}$, $F_{max}$ which are expected to correspond to each of these outcomes.

For the three cases in which there is a positive settlement, consider schedules relating fees to settlements in a linear way:

$$F = a + bS$$

so that the problem involves selecting the constants $a$ and $b$. It seems reasonable that if $S_{min}$ is the outcome, the fee should at least cover direct cost, or that

$$F_{min} = a + bS_{min} = C$$

$$\text{or that } a = C - b(S_{ave} - S_{min})$$

$$\text{Then } F_{ave} = C + b(S_{ave} - S_{min})$$

$$\text{and } F_{max} = C + b(S_{max} - S_{min})$$

That is, the fees in the two "good" outcomes are set at cost C plus a premium for above minimal settlements, $S - S_{min}$.

Second, the expected return from undertaking the case must be enough to cover costs. This implies

$$\frac{1}{4}[F_{min} + F_{ave} + F_{max}] = C$$

If, as assumed above, $F_{min}$ is set at C, this conditional is equivalent to

$$\frac{1}{2}(F_{ave} + F_{max}) = \frac{3}{2}C.$$

That is, the average fee for the two "good" outcomes must equal 1.5 times cost. A second expression for this quantity is obtained by averaging the two expressions for $F_{ave}$ and $F_{max}$ above:

$$\frac{1}{2}(F_{ave} + F_{max}) =$$
$$C + b[\frac{1}{2}(S_{ave} + S_{max}) - S_{min}]$$

Combining gives:

$$b = \frac{C}{S_{ave} + S_{max} - 2S_{min}}$$

This example may be made more concrete through the use of some (not wholly) hypothetical numbers. Take C to be equal to $9.9 million. (This is a relatively hard estimate of the actual cost incurred in the Folding Carton Case, which will be discussed in more detail below.) Take $S_{min}$ to be $30 million: a settlement actually offered by defendants, and hence an estimate of what might be regarded as a minimal settlement, warranting a minimal fee. Take $S_{max}$ to be $200 million: the settlement actually obtained. Finally, let $S_{ave}$ be $80 million: a rather open guess as to what might have been arrived at with good, but not outstanding counsel. With these specifics, the formulas arrived at above yield a fee schedule of

$$F = 8.55 + (.045)S.$$

Table 1 gives the fee implied by this formula for various possible settlement values.

### Table 1

| Settlement ($ millions) | Fee ($ Millions) |
| --- | --- |
| 30 | 9.9 |
| 80 | 12.1 |
| 130 | 14.4 |
| 200 | 17.6 |

The table is based on a hypothetical "model" which attempts to capture in a rough way the possible outcomes of the Folding Carton litigation as they might reasonably have appeared when the case was undertaken and when it was underway. Changes in assumptions would, of course, alter the outcome of these calculations. (See Appendix A for some alternative calculations.) Nevertheless, the incentives described in Table 1 seem to be near to the minimal required to motivate law firms to undertake promising anti-trust cases and to develop them as skillfully as possible, once undertaken. The fee of $9.9 m. for the minimal settlement covers direct costs and no more, leaving $20.2 m. for the clients. For every dollar obtained above 30 m. this schedule assigns 4.5¢ in fees and 95.5¢ to clients.

The matter of estimating direct cost has been postponed to this point, and requires attention. Over a period of 40 months, $7 m. was expended. Since these costs were incurred prior to the award of fee, they must be cumulated at compound interest to the time of fee award in order to put costs and returns in comparable units. Once an appropriate interest rate (a measure of the return which these expenditures would have enjoyed had they not been expended for purposes of this case) is selected, this calculation is routine. I have employed an annual rate of 20%, so that direct cost, as of the date of the fee award, are $7 m. × 1.42 = $9.9 m. This rate reflects, certainly not excessively, the risky character of the investment involved in committing funds to an enterprise with so open an outcome. (See Appendix B for fee schedules under alternate interest rates.)

This analysis has required a number of simplifications or abstractions from the complexities of the Folding Carton case. Much of the hypothetical nature of the argument used is, however, inherent in the character of the problem. The essence of establishing fees in an individual case is the effect this will have on *incentives* in future, roughly comparable cases. Estimation of

this effect necessarily involves not simply measuring what has already happened (direct costs) but also trying to estimate the way in which the fees arrived at in the present case will motivate legal activities in future cases (incentive effects).

There are several aspects of this analysis which could stand refinement. I have treated the case as though it involved a *certain* cost commitment of $9.9 m. and a settlement which is *entirely* unknown until the very end of the process. In fact, of course, information on both costs and the likely settlement became known gradually throughout the process. Analytical methods exist for treating this sequential aspect of the problem with more care than I have employed. In my opinion, the use of these methods would most probably increase confidence in, but not materially alter, the conclusions arrived at above. Similar remarks apply to my use of a 20% interest rate: utilizing the vast literature on the relationship of risk and rate of return would surely sharpen this estimate. Finally, perhaps the most arbitrary element in the above was my assignment of probabilities to various possible outcomes. I have assumed that an informed person, at the outset of the case, would have taken either side of a 3–1 bet on the possibility of a $200 m. settlement. There is no method by which we can ever "know" whether this was the case, but it does not seem an extreme view to assume that these odds are not too long.

In summary, a fee of $17.6 m. in this case seems to me a reasonable and conservative estimate.. It is based on costs which I have valued at $9.9 m., and which have already been tangibly incurred. More important, in my view, it is based on necessarily less precise estimates as to the effects of this fee determination on the incentives for anti-trust litigation to be undertaken and successfully pursued in the future.

*Appendix A*

Table A–1 below, reproduces Table 1 under some alternative assumptions.

Table A–1:  Alternative Schedules

| Settlement | Fee A | Fee B | Fee C |
|---|---|---|---|
| 30 | 9.9 | 9.9 | 6.9 |
| 80 | 14.5 | 11.3 | 11.9 |
| 130 | 19.2 | 12.6 | 16.8 |
| 200 | 25.7 | 14.5 | 23.8 |

Schedule A is constructed under the logic described above, but with assumed probabilities of .3 for settlements of 0, 30 and 80 and a probability of .1 only for 200. The incentive on this schedule (the value of b) is .093. Schedule B is constructed in the same way, but with probabilities of .1 for *both* outcomes 0 and 200, and .4 for 30 and 80. In the case, b = .027. In this case, however, it seems unlikely that a settlement of $30 m. would be regarded as adequate to justify a fee of full cost. Schedule C is constructed with the *same* probabilities as B, but with a fee for $30 set at $6.9 m., or 70% of costs. In this third case, b = .093.

*Appendix B*

Table B–1 below, presents the analogues to the schedule in Table 1 in the text, under discount rates of 10%, 20% (as in Table 1) and 30%. The costs under these rates are $8.3 m., $9.9 m., and $12 m. respectively.

Table  B–1

Fees for Interest Rate (annual percent) of

| Settlement | 10 | 20 | 30 |
|---|---|---|---|
| 30 | 8.3 | 9.9 | 12.0 |
| 80 | 10.2 | 12.2 | 14.8 |
| 130 | 12.1 | 14.4 | 17.5 |
| 200 | 14.8 | 17.6 | 21.4 |

EXHIBIT NO. 5

RE:  FOLDING CARTON ANTITRUST LITIGATION—MDL 250

PLAINTIFFS' COMMITTEES AND ASSIGNMENTS

July 12, 1976

NOTE:  Listing of members of committees and subcommittees have been made in alphabetical order where possible.

## CLASS ACTION COMMITTEE

Members of the Executive Committee

#### MEMBERS

Charles Bassford
Mitchell Kramer
Arnold Levin
H. Laddie Montague
Donald N. Ruby
Ira Jay Sands

NOTE: Harold Kohn and Lowell Sachnoff have begun preparation of a Class Action brief in conjunction with Joe Cooper (Chairman of the Briefing Committee) and others.

### BRIEFING COMMITTEE

| Josef Cooper | Chairman |
| Stephen Susman | Vice Chairman |
| Lawrence Eiger | Vice Chairman |
| Lowell Sachnoff | Liaison |

#### MEMBERS

Harvey S. Kronfeld
Judah Labovitz
Edward Mannino
Douglas V. Rigler
Samuel H. Seymour

## INDUSTRIAL INFORMATION COMMITTEE

| Elwood P. Kendrick | Chairman |
| Perry Goldberg | Liaison |

#### MEMBERS

Floyd Boline
Michael P. Connelly
Arthur M. Mintz
Jerrold Salzman
Robert A. Skirnick
Lawrence Walner

### FINANCE COMMITTEE

| Jerome S. Wald | Chairman |
| Kalman Schein | Vice Chairman |
| John Cochrane | Liaison |

### DISCOVERY COMMITTEE

| David Shapiro | Chairman |
| Jack Chestnut | Vice Chairman |
| Guido Saveri | Vice Chairman |
| Lee A. Freeman | Liaison |

#### MEMBERS

Jerome S. Cohen
Joseph A. Ginsburg
Kenton C. Granger

## REGIONAL DISCOVERY—COORDINATORS:

Western—Josef Cooper
Middle Western—Jack Chestnut
Eastern—Stanley Grossman
Southern and Southwestern—Stephen Susman

NOTE: Arthur Galligan and Jerrold Salzman have begun working on a set of first wave interrogatories to defendants which are due to be filed on or before September 15, 1976.

## DISCOVERY SUBCOMMITTEES

Container Corp.—(Chi)
  Lee A. Freeman, Jr.
  Stephen Susman
Alton Box Board Co.—(Alton, Chi)
  Howard Fink
  Howard A. Specter
American Can—(Conn, Ga)
  David J. Beckwith
  Arnold Levin
  Samuel Seymour
Brown Co.—(Pasadena)
  Elwood Kendrick
  Ben Schwartz
Burd & Fletcher—(Mo)
  Earl Nagels
  Harry Rubenstein
F. N. Burt—(NY)
  Stanley Grossman
  Benedict Wolf
Champion International—(Conn)
  Lowell Sachnoff
  Robert Walner
Consolidated Packaging—(Ill)
  Lawrence Eiger
  Jerome Wald
Diamond International—(NY, Ohio)
  Alfred S. Julien
  Seymour Kurland
  Benedict Wolf
Eastex Packaging—(Ill)
  Larry Walner
Federal Paper Board—(Conn, NJ)
  Harvey S. Kronfeld
  Edward F. Mannino
  Douglas V. Rigler
  Stephen Susman
Fibreboard Corp.—(Cal)
  Josef Cooper
A. L. Garber—(Ohio)
  David Logan
  Robert Mattson

278

DISCOVERY SUBCOMMITTEES—Contined

Hoerner Waldorf—(Minn)
  Jack Chestnut
  Daniel Shulman

International Paper—(NY)
  Jerry Cohen
  Mitchell A. Kramer

Interstate Folding Box—(Ohio)
  John Cochrane
  Ira Jay Sands

Mead Corp.—(Ohio)
  Michael D. Buchwach
  Granvil Specks

Michigan Carton—(Mich)
  Edward Berman

Packaging Corp. of America—(Ill)
  Michael Freed
  Harold A. Kohn
  Lowell Sachnoff

Potlatch Corp.—(Cal, Ill)
  Joseph Alioto
  David B. Gold

Rexham Corp.—(NY, Conn)
  H. Laddie Montague
  Ellis M. Sostrin

St. Regis Paper—(NY, Mich)
  Stuart Schlesinger
  David Shapiro
  Howard A. Specter

Weyerhaeuser Corp.—(Wash, Cal)
  William Ferguson
  David Gold

COORDINATION OF COMPLIANCE WITH
DEFENDANTS' DISCOVERY
& MOTIONS

Howard A. Specter    Chairman
Ben Schwartz    Vice Chairman
William Ferguson    Liaison

MEMBERS

Michael J. Freed
Arthur Galligan
H. Laddie Montague
Douglas V. Rigler
Granvil I. Specks

NEW DEFENDANTS COMMITTEE

Lee A. Freeman
Perry Goldberg
Harold Kohn
David I. Shapiro
James B. Sloan
Joseph R. Tydings