**In the Matter of SUPERIOR BEVERAGE/GLASS CONTAINER CONSOLIDATED PRETRIAL.**

**This Document Relates to: All Class Actions.**

No. 89 C 5251.

United States District Court, N.D. Illinois, E.D.

Oct. 26, 1990.

**120**

John C. Brezina, David C. Brezina, Brezina & Buckingham, Hinsdale, Ill., Anthony S. DiVincenzo, Campbell & DiVincenzo, Chicago, Ill., for Citrus Corp. of America.

Michael J. Freed, Steven A. Kanner, Much, Shelist, Freed, Denenberg, Ament & Eiger, P.C., Chicago, Ill., for Contract Beverages, Inc.

James B. Sloan, William T. Gotfryd, Pederson & Houpt, P.C., Chicago, Ill., John A. Cochrane, Cochrane & Bresnahan, Saint Paul, Minn., for Eastern Brewing Corp.

James B. Sloan, William T. Gotfryd, Pederson & Houpt, P.C., Kenneth H. Hanson, Chicago, Ill., for Florida Fruit Juices, Inc.

Michael J. Freed, Steven A. Kanner, Much, Shelist, Freed, Denenberg, Ament & Eiger, P.C., Gary L. Specks, Richard A. Sloan, Altheimer & Gray, Chicago, Ill., David E. Beckwith, Foley & Lardner, Milwaukee, Wis., for G. Heileman Brewing Co., Inc.

Edward A. Berman, Edward A. Berman, P.C., Chicago, Ill., Joel C. Meredith, Steven J. Greenfogel, Meredith & Cohen, P.C., Philadelphia, Pa., for Korbro Oil Corp.

Melvyn L. Segal, Chicago, Ill., Jeffrey M. Forster, Samuel J. Cohen, Berliner, Cohen & Biagina, San Jose, Cal., for Mayfair Packing Co.

Melvyn L. Segal, Chicago, Ill., for Novitiate Wines, Inc.

Michael J. Freed, Steven A. Kanner, Much, Shelist, Freed, Denenberg, Ament & Eiger, P.C., Phillip C. Goldstick, Stewart M. Weltman, Phillip C. Goldstick & Assoc., Chicago, Ill., for Pastorelli Food Products, Inc.

Granvil I. Specks, Perry Goldberg, Specks & Goldberg, Chicago, Ill., Guido Saveri, Saveri & Saveri, San Francisco, Cal., A. Martin Katz, J. Michael Katz, Katz, Brenman & Angel, Merrillville, Ind., Gary L. Specks, Richard A. Sloan, Altheimer & Gray, Chicago, Ill., for Superior Beverage Co.

Melvyn L. Segal, Chicago, Ill., Jeffrey M. Forster, Samuel J. Cohen, Berliner, Cohen & Biagina, San Jose, Cal., for Turgeon & Lohr Winery.

William M. Bitting, Hill, Farrer & Burrill, Los Angeles, Cal., Scott A. Brainard, Scott A. Brainard, Ltd., Chicago, Ill., for General Brewing Co., Inc., et al.; Pabst Brewing Co., et al.

Josef D. Cooper, Cooper Law Offices, San Francisco, Cal., for Safeway Stores, Inc.

Thomas R. Meites, Michael M. Mulder, Joan H. Burger, Meites, Frackman & Mulder, Chicago, Ill., for CPC Intern., Inc.

John P. Ryan, Jr., Geoffrey G. Gilbert, McBride, Baker & Coles, Chicago, Ill., for Anheuser–Busch Companies, Inc.

Thomas G. Bailey, Jr., Whitman & Ransom, New York City, for American Food Corp., et al.

Francis J. McConnell, Chicago, Ill., for Dean Foods Co., et al.

James B. Sloan, William T. Gotfryd, Pederson & Houpt, P.C., William A. Huff, Huff & Kennedy, Chicago, Ill., for Chesebrough–Pond's Inc., et al.

James B. Sloan, William T. Gotfryd, Pederson & Houpt, P.C., Chicago, Ill., Richard S. Bishop, Hourigan, Klinger, Spohrer & Quinn, Scranton, Pa., for Central Soda Water Co.

Melvyn L. Segal, Chicago, Ill., Jeffrey M. Forster, Samuel J. Cohen, Berliner, Cohen & Biagina, San Jose, Cal., for Frank–Lin Distillers Products, Ltd.

Thomas R. Meites, Michael M. Mulder, Joan H. Burger, Meites, Frackman & Mulder, Chicago, Ill., for Beatrice Co., Inc.

Earl E. Pollock, Jeffrey L. Dorman, Gary Senner, Blake L. Harrop, Sonnenschein, Nath & Rosenthal, Chicago, Ill., Marvin D. Morgenstein, Morgenstein & Jubelirer, San Francisco, Cal., for Owens–Illinois, Inc.

John H. Morrison, Randall A. Hack, William R. Jentes, Kirkland & Ellis, Chicago, Ill., for Dart Industries, Inc.

Jack E. Brown, H. Michael Clyde, Brown & Bain, P.A., Phoenix, Ariz., H. Blair White, Charles W. Douglas, David M. Schiffman, Sidley & Austin, Chicago, Ill., for Brockway, Inc.

## MEMORANDUM OPINION

WILL, District Judge.

We now consider the final fee petitions submitted by plaintiffs' class counsel—from twelve law firms and representing the work of more than 50 lawyers and 40 paralegals, over four years, from August 1, 1986 through early July 1990. Fees have

already been awarded in this antitrust class action twice before, covering the periods up through July 31, 1986. The prior awards, which were paid out of funds generated by settlements reached with several defendants early in the case, totaled roughly $1.7 million. Counsel now request additional final fees of approximately $13.9 million. Having reviewed and considered the pending petitions, along with the accompanying time records and affidavits, we are now prepared to approve further fees in the aggregate amount of $11,480,163. A separate proposed order is attached. Class counsel or defendants who may wish to file objections or suggestions regarding this opinion, the proposed order or our award will be heard on Monday, October 29, 1990, at 2:00 P.M.

## I. Factual Background

This litigation began in 1983 when several major purchasers of glass containers, without the benefit of a preceding criminal prosecution, filed suit against Owens–Illinois, Inc., Brockway, Inc., Dart Industries, Thyssen–Bornemisza, Inc., Anchor Hocking Corp., Chattanooga Glass Company, Inc., Glass Containers Corp., Beatrice Companies, Inc., Esmark, Inc., and Norton Simon, Inc., alleging a nationwide price fixing conspiracy in violation of § 1 of the Sherman Act. By October 1986, seven of the defendants had settled out of the case, leaving only Owens–Illinois, Brockway and Dart. On December 18, 1987, Judge Rovner certified a plaintiff class.[1] Sixteen glass purchasers opted out of the plaintiff class and filed individual suits.

The allegations in the class complaint spell out a scheme of alleged garden variety price fixing. Defendants allegedly "agreed to fix ... prices of glass containers," "imposed general industry-wide terms and conditions of sale," which "were inconsistent with free price competition," and

agreed to and did allocate customers and accounts.

As discovery progressed, there was some common ground between the parties. It was not disputed, for instance, that Dart obtained and followed Owens–Illinois' price lists for many, if not all, of its own price lists; that various defendants at various times met with each other during trade association meetings; that during certain periods of the alleged conspiracy the glass container market was characterized by "substantial overcapacity"; and that alternatives to glass, such as plastic, metal and paper, were available to most class members during certain periods for some end uses, although these substitutes were not perfect substitutes for glass and were less attractive than glass for some purchasers. (Beer, for example, does not sell well in plastic.) The significance, if any, to be attached to these facts was bitterly disputed.

On June 15, 1990, however, the disputes subsided. The class and the defendants entered into a settlement agreement. That agreement provides for the issuance, by Owens–Illinois and Brockway, now operating as a single company, of up to 70 million dollars worth of discount purchase certificates (face value) and in no event less than 49 million. The certificates are to be made available to class members upon proof of claim and "shall be redeemable for cash rebates on future glass container purchases from Owens Illinois." The certificates are transferable under certain limited circumstances.

The settlement agreement was approved by the court on August 8, 1990.

In addition to providing for discount certificates, the settlement agreement also stipulates, among other things, that the three remaining defendants "shall be jointly and severally liable for the payment of any attorneys' fees of Plaintiff Class as are

---

**1.** As slightly modified on February 21, 1990, the class definition provides for a plaintiff class of:

All persons, firms, corporations or other entities in the United States (excluding defendants in all related cases and other manufacturers of glass containers, and all glass container distributors in the United States, their respec-

tive parents, subsidiaries and affiliates) that purchased glass containers for commercial packaging or bottling during the period from January 1, 1970 to December 31, 1982 from any defendant in any of the related cases or any parent, subsidiary or affiliate thereof.

approved by the Court." As contemplated by the agreement, class counsel have submitted fee petitions and time records for our approval. We have reviewed these submissions, as contemplated by the agreement, and now proceed to approve fees of $11,480,163. In arriving at this figure, we have made all calculations in conformity with the guidelines and rules of thumb set out below.

## II. The Choice Between Lodestars and Percentages

■ The history of attorney fees awards, from *Trustees v. Greenough*, 105 U.S. 527, 26 L.Ed. 1157 (1882) and *Central Railroad & Banking Co. v. Pettus*, 113 U.S. 116, 28 L.Ed. 915 (1885) forward to *Mills v. Electric Auto-Lite*, 396 U.S. 375, 389–97, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970) and up through *Lindy Bros. Builders v. American Radiator & Sanitary Corp.* ("Lindy I"), 487 F.2d 161 (3d Cir.1973), *aff'd in part and vacated in part*, 540 F.2d 102 (3d Cir.1976) ("Lindy II") and *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974), has been sketched and commented on elsewhere. See *Mashburn v. National Healthcare, Inc.*, 684 F.Supp. 679, 687–689 (M.D.Ala. 1988); *In re Folding Carton Antitrust Litigation*, 84 F.R.D. 245, 255–63 (N.D.Ill. 1979). The upshot is that up until *Lindy* in 1973, fees were awarded out of a common fund on a percentage basis. Beginning with *Lindy*, the approach changed. Many courts began using a "lodestar" or time/rate analysis.

The last time this court undertook to award fees on a scale comparable to the awards in this case was eleven years ago, in 1979. See *In re Folding Carton, supra.* At that time, we used a modified lodestar method. Since 1979, however, reservations about lodestars have been expressed in several quarters.[2]

Quite recently, at least three district courts have inveighed against lodestars, one of them abandoning the lodestar approach altogether.[3] In 1984, the Supreme Court seemed, in a glancing footnote, to assume that a "reasonable fee" in a common fund case "is based on a fair percentage of the fund," *Blum v. Stenson*, 465 U.S. 886, 900 n. 16, 104 S.Ct. 1541, 1550 n. 16, 79 L.Ed.2d 891 (1984), and some lawyers have wondered in print whether "[t]he movement against the lodestar [isn't] turning into a stampede." Solovy and Kaster, *Re–Examining The Lodestar*, National Law Journal, April 9, 1990, p. 13. The Seventh Circuit has questioned the "efficiency" of lodestars but has not directed or even recommended that district courts in this circuit should abandon them:

> Although there are certainly grounds for believing that a percentage fee arrangement would be more efficient than the current approach (of calculating a lodestar and then determining an enhancer, where appropriate), we will not overturn what seems to have become the accepted method of determining fees in this circuit.

**2.** See especially, Report of the Third Circuit Task Force, Court Awarded Attorney Fees, 108 F.R.D. 237 (1985) (concluding that the *Lindy* method is a "cumbersome, enervating, and often surrealistic process of preparing and evaluating fee petitions" and that "in the traditional common-fund situation ... the district court, on motion or its own initiative and at the earliest practicable moment, should attempt to establish a percentage fee arrangement agreeable to the Bench and to plaintiff's counsel.")

**3.** See *Activision Securities Litigation*, 723 F.Supp. 1373 (N.D.Cal.1989) ("[I]n class action common fund cases the better practice is to set a percentage fee and ... absent extraordinary circumstances ... the rate should be set at 30% ... In the future ... [this] court will opt for the percentage approach in common fund cases."). See also *Mashburn*, 684 F.Supp. 679; *In re Union Carbide Corp. Consumer Products Business Securities Litigation*, 724 F.Supp. 160, 170 (S.D. N.Y.1989) ("The Court notes that these fees amount to approximately 27% ... Such an award is consistent with the new learning (old wine in a new bottle) ... which new learning we believe will proceed from West to East and take us back to straight contingent fee awards bereft of largely judgmental and time-wasting computations of lodestars and multipliers. These ... computations, no matter how conscientious, often seem to take on the character of so much Mumbo Jumbo. They did not guarantee a more fair result or a more expeditious disposition of litigation.").

*Skelton v. General Motors Corp.*, 860 F.2d 250, 255 n. 4 (7th Cir.1988).

We remain convinced, as we were in 1979, that rigid application of any method, whether lodestar or percentage, is a mistake but that some form of time/rate multiplier analysis modified, if necessary, to reflect a reasonable percentage of the recovery, is the best way to calculate reasonable and fair fees. We note that neither class counsel nor the defendants have suggested that fees should be awarded on a straight percentage basis in this case and that all the firms that have petitioned for fees have submitted lodestar figures.

### A. *The Problems with Percentages*

■ The notion of awarding fees out of a common fund on a straight percentage-of-the-pot basis, without regard to billed hours, is overly simplified and shortsighted. In a case where the class is represented by more than one law firm (and that happens almost always) how does the court divide up a percentage award between (or among) the firms? Sometimes, the division is left to the firms themselves. In some cases, the firms stipulate to their "cuts" or "points" at the end of the case, in others, at the beginning. If the firms cannot agree, then the dispute falls back into the court's lap, and we see only one way to resolve such a dispute—by returning to the time sheets and calculating who toiled how many hours doing what. In other words, percentages frequently end up with lodestars when there is more than one firm in the case. In this case, there were twelve firms representing the class. How often firms will be able to negotiate fee arrangements among themselves—and plaintiffs' lawyers do manage such divisions in some cases—is an empirical question. There are, though, still other more serious problems with percentages.

In this case, the settlement provides for up to $70 million but in no event less than $49 million dollars in discount certificates, all redeemable in installments over a period of ten years. What is 30% of *up to* $70 million payable over a period of years? And how are fees, to be awarded in cash, to be compared to a recovery that consists of certificates, warrants or chits? Similar problems, of course, are presented in a personal injury case where part of the settlement provides for an annuity, and economists and accountants in such cases calculate the present value of the annuity and then calculate the contingent fee from the discounted value. Calculating the cash value of certificates is trickier than calculating the present cash value of an annuity but is still possible. Nonetheless, what is the present cash value of a class recovery that provides for certificates, redeemable over time, in an undetermined amount to range from 49 to 70 million?

Percentage contingent fees also present a problem of "sell-out" settlements:

> Suppose a defendant offers $100,000, the contingent fee [or percentage of the common fund promised by the court] is 30 percent regardless of when the litigation ends, and the lawyer is sure he can get a judgment for $120,000 if the case is tried but knows that it will cost him, in time and other expenses, $8,000 to try it. [The class] will be better off if the case is tried, for after paying the lawyer's fee [class members will still collect] $84,000 ... rather than $70,000 if it is settled. But the lawyer will be worse off, since his additional fee, $6,000 ($36,000 minus $30,000) will be less than the trial costs of $8,000....

*Chesny v. Marek*, 720 F.2d 474, 477 (7th Cir.1983).

Finally, a still more fundamental problem, and the major problem, with pure fixed percentage awards arises from the very notion of using fixed percentages at all. *Fixed percentages will drastically overcompensate lawyers in some cases and drastically undercompensate them in others.* Twenty-five or thirty percent might be an appropriate award on a recovery of a million dollars. It is likely, on the other hand, to result in a windfall in a case where the recovery totals many millions of dollars. The same reasoning also works in reverse. Seven percent will usually be a "paltry" award on a recovery of four mil-

lion, see e.g., *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268 (9th Cir. 1989), depending on the hours worked and the risk incurred in bringing the case, but may be an appropriate award on a recovery of two hundred million. The point is that "percentage" is a relational concept. Percentage *of what?* Fifty percent is neither a lot nor a little, until one knows what the underlying whole is. Half of one cookie isn't much. Half of a full cookie jar may well be a lot.

There is no necessary logical connection between percentages and reasonable compensation. At best, percentages are simply a rough and ready way of estimating contingency plus effort. It is our opinion that there are better ways of estimating both.

### B. *The Objections to Lodestars*

Many, though not all, of the objections to lodestars seem to us to be overstated. We will address eight of them.

First, there is no question but that calculating lodestars takes more time than awarding fees by percentages, and this is a drawback. We suspect that many courts frown on lodestars for this reason alone. There are a number of time consuming steps in calculating lodestars—(1) reviewing the time records to weed out hours not spent benefiting the class, (2) going back and tallying the hours left, in many cases separately per firm and per lawyer and paralegal, since different firms or different lawyers within a firm will be compensated with different hourly rates, (3) determining a reasonable hourly rate for each lawyer or paralegal, (4) calculating a lodestar for each firm, (5) determining the proper multiplier, if any, and (6) multiplying the lodestar by the multiplier. In our experience, it is the second step, which consumes by far the most time. But it need not. If courts required firms to submit time records for each lawyer or paralegal on disk in Lotus or some other spreadsheet format specified by the court, there would be no trick to tallying the hours. Running spreadsheet programs is neither burdensome nor time-consuming. More time-consuming than

percentages to be sure, but for a more reasonable result.

Second, there is no reason why under a lodestar approach there should necessarily be widespread variation in fees awarded by different judges to the same lawyers in the same community. The rate to be awarded is the rate a lawyer normally charges paying clients, unless that rate is unreasonable —i.e., unless it exceeds the going rate for comparable work. There may be some dispute as to what the going rate is, but note that there will also be disputes, under a percentage approach, over what a reasonable percentage is.

Third, we have not found, either in this case or others we have handled, that lodestars lead most lawyers to pad their time records. And to the extent that there is either padding, in terms of fictitious hours, or "lodestarring," careful judges and their staffs should be able to spot the worst, if not all, abuses.

Along the same lines, we also have not found that lodestars lead most lawyers to inflate their "normal" billing rates. A policy of not awarding rates that are clearly out of line with the going rate certainly acts as a restraint. We have occasionally seen some lawyers raise their billing rates dramatically during the course of a case, perhaps in hopes of "lodestarring" the court. But abuses of that sort are fairly easily identified by asking all lawyers to submit fee schedules showing historical rates and by comparing rate hikes in one firm with rate hikes in another. If most firms have, in any given year, raised their rates by ten or twenty dollars an hour, but one firm has raised rates by fifty-five, the possibility of lodestarring is plain.

█ Fourth, lodestar fee awards, properly calculated, take into account skill as well as time. It is not true that lodestar fees leave talent unrewarded. The greatest fear in this regard seems to relate to the scenario of the difficult case that is settled very quickly as the result of a brilliant effort by an extraordinarily skilled lawyer for the class. The lodestar in that kind of a case is de minimis. Few hours were expended. But compensation should not be

de minimis, and need not be, even if a pure percentage method is not used. It is obvious that one hour well spent may produce more and better results than one hundred plodding hours of mediocrity. And that one hour should be compensated equally, even more generously, than the one hundred hours. Obviously, one hour makes for a smaller lodestar than one hundred. But that is where multipliers step in. *There is no reason that multipliers, in such cases, should be low.* We recognize that historically multipliers have been low in most cases. That is primarily because the quick, magnificent recovery rarely occurs in the real world. We see no reason, however, that they must be or that any court should ever set an upper limit on multipliers applicable to all cases. Many, even most, of the objections to lodestars posed by plaintiffs' lawyers appear to us to stem from fears about low multipliers. But multipliers need not be low. Frequently when they are, it is because a higher multiplier would result in an unreasonable fee.

Fifth, there is no per se reason that lodestars should create disincentives for the early settlement of cases generally. The objections here seem to be of two types. First is a concern about "slam dunk" cases. If fees are awarded by lodestar, so goes the argument, then there is no incentive to settle a slam dunk case early on, though it *should* be settled early on, because settling early results in a low lodestar and a low lodestar means low fees. The answer to this is that in the hands of a capable judge a slam dunk case will not settle late and hours need not be padded to obtain a reasonable fee. If liability is clear, then there should be case dispositive motions, either to dismiss or for summary judgment, and no further discovery should be allowed until the motions have been ruled on. If no dispositive motions are filed, but it is apparent to the judge that the case would have been or was an easy win, long hours will not be remunerated or can be remunerated against a *negative* multiplier.

The second objection is broader and stems from the view that lodestars encourage long hours, not just padded hours, and in all cases not just slam dunks. This is a serious concern but is often grossly exaggerated. Most lawyers prefer to be paid as soon as possible and the nature of deferred fees in itself discourages excessive hours. A lawyer who thinks and acts as a rational maximizer will not log more hours than are necessary in a case where, because it is contingent, there may not be fees at all in the end. In common fund cases fees are always uncertain—absent a favorable judgment or a settlement, there is no compensation. Class litigation is risky, and a lawyer as a rational maximizer will not compound his or her risks by logging long hours that might wind up unrewarded.

■ Further, in no case, even under a time/rate analysis, should a fee award consume an untoward portion of the class recovery. And in this sense, even judges who use time/rate analyses always blend lodestars and percentages. No judge reasonably awards fees by looking *only* at hours. What is left for the class, after fees have been awarded, is always a paramount consideration. *The size of the settlement necessarily suggests upper (and lower) limits on permissible fees, in a common fund case, no matter how many hours were logged.* That is axiomatic. Hours are not rewarded simply because they were toiled. They are rewarded, consistent with the common fund theory, because they brought benefit to the class. Recognition among lawyers and judges that long hours will not be fully compensated where the result is a fee award that dwarfs what's left for the class should deter many of the abuses of lodestarring.

Sixth, there is no per se reason that lodestars should encourage opportunistic litigation. The manner by which fees are awarded clearly structures incentives. Overly generous fee awards may encourage nuisance suits and "strike" litigation with no merit. Lawyers *should* be made to think twice before filing massive, complicated cases of clearly marginal merit. See Judge Weinstein's comments in *In re "Agent Orange" Product Liability Litigation*, 611 F.Supp. 1296 (E.D.N.Y.1985).

Lodestars, however, provide stronger incentives for opportunistic litigation than percentages do only if lodestar awards are more generous than percentage awards. And there is no per se reason that they should be. (Many plaintiffs' attorneys, in fact, tend to believe that lodestar awards are frequently lower than percentage awards.)

There undoubtedly are cases brought by opportunistic counsel who, by logging long hours and forcing defense counsel to log similar hours, harass defendants into settling by running up costs and fees and creating bad press. But in these cases, and particularly where only a modest settlement is reached, full compensation for long hours may be inappropriate. As we have said, where the lodestar is large and the recovery is small adjustments may be called for.

Seventh, while defense lawyers frequently express concern that lodestars encourage opportunistic litigation, plaintiffs' lawyers frequently complain that lodestars discourage meritorious litigation. One form of this fear is related, again, to the slam dunk case—massive damages, quick settlement. Many plaintiffs' lawyers seem to feel that it is not worth bringing such cases on behalf of a class for lodestar fees, that their time is better spent bringing contingent fee cases where compensation is much more generous, that the opportunity costs involved in bringing lodestar cases make them a very poor investment where time could be spent on contingent, percentage recoveries instead. This argument, however, reveals less about the inadequacy of lodestars than it does about an information failure in a market where clients are willing to sign high-percentage contingent fee contracts (40% percent in many of the asbestos cases currently pending in this district) to have lawyers bring cases where liability is clear or almost certain and the work is minimal.

The plaintiffs' bar, however, also has a much more serious and legitimate concern about lodestars, namely that they may undercompensate for risk. But a lodestar, enhanced by an appropriate multiplier, should not undercompensate for risk.

Fees that are contingent on success present definite risks. Payment, if any, is deferred, and there is always a risk, often a very substantial risk, that there may be no payment at all. Unless a case settles or ends in a favorable judgment for the class, work goes uncompensated. The "best" case can be lost and the "worst" case can be won, and juries may find liability but no damages. None of these risks should be underestimated.[4]

It is axiomatic that risk demands a premium. And, as a general rule, the greater the uncertainty of payment the greater the premium should be. Risk must be assessed ex ante. Lawyers make decisions about whether to bring lawsuits on the basis of the risks and rewards they perceive at the beginning and must be compensated on the basis of the risks as they appeared at the beginning, not as the court perceives them at the end of the litigation. Obviously, the hard question is what the compensation for risk should be. Many cases do not present a better than 50–50 chance of success at the beginning, before discovery has been conducted and the evidence is in, which suggests that often a multiplier of at least 2 for risk would be appropriate at least for the principal counsel in the case who invest the most in time and money and have the least choice about doing so.

■ *The essential point is that a straight hourly rate is not reasonable compensation in most contingent cases.* Class counsel run risks of nonpayment in every class case and those risks must be compensated. How much the compensation should be will depend on how much incentive lawyers need to bring class cases. Much more research is needed on that sub-

---

**4.** Without expressing a view as to the merits of this case as it has been developed through discovery, we note that at the time the complaint was filed, the class had theories that might sup-port a finding of liability but no smoking gun evidence of price fixing. The risks of undertaking this litigation were substantial.

ject. In any event, fees must bear some relationship to the time spent and amount recovered.

Eighth, and finally, a number of courts and commentators, after reviewing common fund awards, have concluded that the majority of common fund fee awards fall between 20 and 30 percent of the fund, no matter what method is used. See *In re Activision*, 723 F.Supp. at 1377–78; Third Circuit Task Force Report, *supra*, 108 F.R.D. at 247 n. 32; H. Newberg, *Attorney Fee Awards*, § 2.08 at 51–56 (1986). The empirical basis for this conclusion escapes us. Certainly, the size of the award has, and should, vary with the size of the fund. Newberg himself states that "[e]mpirical analysis of fee precedents tends to show that for common fund and derivative shareholder suit recoveries of approximately $40–$75 million, fee awards usually fall in the *13–16 per cent range.*" Newberg, *Attorney Fee Awards*, § 2.09 (Supp.1990 at 12) (emphasis added). And the tables in Newberg reflect that, for whatever reasons, in antitrust suits with recoveries in excess of $25 million, fee awards have been closer to 12% than 20 to 30. In cases with recoveries in the $100 million and over range, fees have been less than 10% and even less than 7%. *In re Folding Carton*, 84 F.R.D. 245.

### C. *A Hybrid Approach*

■ Fee determinations call for the exercise of informed discretion. There are no easy formulas. This is not an exact science. The best short statement may be that the size of an award should be reasonably arbitrary—meaning that there is no magic in the precise final numbers but that they must be reasonable, which is to say, the result of considered, articulated and fair judgments. The aim is neither to chisel lawyers nor to enrich them at the expense of the class.

Any method used should be flexible. Every case is different, and considerations that are significant in one case may not be in the next. But there are some fairly constant principles, which generally hold true.

Thus, it is our firm belief that no final fee determination can reasonably be made without considering the size of the settlement. Lawyers should be fairly compensated. But settlements must ultimately be negotiated for the benefit of the class, and no fee award should either fleece the class of its recovery or result in a windfall to their lawyers in excess of any efforts those counsel made or risks they ran.

### III. General Evaluation

#### A. *History*

In 1979, the Antitrust Division of the Department of Justice began an investigation into possible price fixing in the glass container industry. That investigation was ultimately terminated without any further action. As a result, private counsel received no assistance from the government's investigation and had to conduct their own. Through extensive discovery, use of private investigators and other means class counsel independently developed a liability and damage case which ultimately resulted in this settlement.

Upon completion of approval of the settlement, this case will represent the largest settlement in any antitrust action brought without the benefit of prior or concurrent government civil or criminal proceedings instituted after a government investigation. The total face value of the maximum of $70 million discount certificates plus the cash payments would approximate $100 million. Reduced to present value, the settlement is in the $70 million range.

Over and above the dollar value of the certificates and cash, the settlement, in the opinion of economic experts, will produce future competitive conditions which will benefit the class and the public. The availability of the discount certificates, the experts opine, will have the effect of heightening competition and lowering prices of all containers which should redound to the benefit of all users of glass and other containers including the general public. The settlement also contains other pro-competitive provisions such as the requirements of making price lists openly available to cus-

tomers and requiring the maintenance of trade association antitrust compliance records which should deter any future price fixing or other collusion.

This was not an easy case for plaintiffs and class counsel. They have outlined and the court agrees that they faced substantial obstacles and risks including:

(i) plaintiffs faced massive opposition to class certification and repeated attempts by defendants to decertify the class;

(ii) until June, 1989, plaintiffs were effectively denied full discovery for the temporal scope of the alleged conspiracy;

(iii) significant portions of the class' conspiracy evidence against certain defendants and co-conspirators either related to the early portion of the class period or pre-dated the class period;

(iv) the Court had under advisement, at the time of settlement, pending motions *in limine* which, if decided adversely to the class, might well have eliminated a substantial part of the class' case against Dart and weakened plaintiffs' case against Owens and Brockway;

(v) the class faced significant risks with respect to establishing proof of fraudulent concealment and damages at trial; and

(vi) Owens–Brockway were simply unable to pay any significant settlement sum in cash due to an enormous negative net worth created by a leveraged buyout. Indeed, there was a significant risk that if the class obtained a substantial judgment against Owens and Brockway they would be forced into bankruptcy, placing the class in an unsecured position *vis a vis* other creditors (in contrast to the secured position in which the class finds itself under the proposed settlement).

### B. *Early Settlements*

In 1983 and 1985 the earlier settlements previously referred to aggregating $11,-300,000 were negotiated and approved and the funds have been held at interest. From that fund, fees and expenses of approximately $2,000,000 have been paid and the fund still has a balance of over $13,800,000.

### C. *Current Settlement*

The lead class counsel have accurately and conservatively summarized the development of the current settlement as follows:

A settlement with the remaining defendants (Owens, Brockway and Dart) was not arrived at until the eve of trial. Prior to May of 1990, the highest total settlement offer made by the remaining defendants to the class was $8 million. During a settlement conference held with the Court as late as early May, 1990, defendants refused to communicate an increased settlement offer to class counsel and took the position that the class' settlement demands were "obscene." Thereafter, with trial imminent, class counsel successfully negotiated a settlement with the remaining defendants having an estimated present value of approximately $60 million, as well as additional value to the class in the form of future pro-competitive benefits.

On June 21, 1990, the Court preliminarily approved the settlement with the remaining defendants and approved the forms of Mail Notice and Publication Notice which provide a July 27, 1990 deadline for objections and a settlement hearing date of August 8, 1990. The Mail and Publication Notices were mailed and published on June 29, 1990. No valid objection was made to the settlement by any member of the plaintiff class.

## IV. Reviewing Time Records

We have reviewed every entry on every time sheet for every lawyer and paralegal in every firm. The Seventh Circuit has suggested that is unnecessary, saying "it is generally unrealistic to expect a trial court to evaluate and rule on every entry" and that it is within a district court's discretion simply to lop off a percentage of the hours requested "as a practical means of trimming fat from a fee application." *Tomazzoli v. Sheedy*, 804 F.2d 93, 98 (7th Cir.

1986). We chose not to assume that there was fat in every application and undertook to make individualized determinations for each firm and each lawyer and paralegal.

■ Unfortunately, many entries on the time sheets were vague. Entries no more specific than "conference with *X*" or "review recent filings" were fairly typical. A court "may eliminate hours that are not documented in sufficient detail," *Tomazzoli*, 804 F.2d at 98 n. 5, and some courts operate on that rule. Rigid application of that rule would have resulted in the elimination of many of the hours requested in this case. Recognizing that even the most descriptive and detailed entry on a time sheet gives little clue about how productively the time was spent and also that the effort required to provide much more detailed and useful entries might not be cost-efficient, we have not generally penalized lawyers and paralegals just for vague entries. Where it was clear to us, however, that the entry was not only vague but that the time was excessive or the description in the entry was a euphemism, repeated in many entries, hours were sometimes cut back. Additionally, as a rule we made reductions of the following sorts:

(1) Occasionally conferences and status calls were overstaffed. Where, for instance, the time sheets showed two attorneys from the same firm present at a status call where one would have sufficed, we gave credit to the attorney with the higher billing rate but deducted the hours of the second attorney.

(2) As in any class case, the time sheets showed evidence of some duplication of efforts. The first time around, work may benefit the class. The second time it does not, and we made appropriate deductions where attorneys and paralegals were clearly reproducing work that had been accomplished before.

(3) We routinely made reductions for some hours over 8 on travel days. A lawyer who logged 11 hours on a given day, 4 of which were spent going to and from the airport or flying, suffered a reduction of 3 hours. We did not make reductions in excess of what we estimated to be the actual travel time. Hours over 8 that were unrelated to travel were credited. Thus, a lawyer who logged 14 hours on a given day, some of which were travel hours, was not automatically knocked down to 8 hours, simply for having traveled. If only three of the 14 hours could have been spent traveling, then 11 work hours were still credited.

(4) Lawyers and paralegals were not credited for excessive time spent reading "correspondence." Nor for "reviewing pleadings" for which they had no responsibility. General "read and review" time was disallowed unless attorneys (or paralegals) had specific responsibility for reading particular documents. Counsel should not be compensated for satisfying their curiosity.

(5) Lawyers and paralegals were not given credit for time spent on tasks that had not been authorized by lead class counsel.

(6) Time spent researching and pursuing issues that were clearly irrelevant to the case or which, even at the time, were self-evidently of no benefit to the class, were not credited.

(7) Lawyers were not credited for performing tasks that plainly should have been performed by paralegals; paralegals were not credited for performing tasks that clearly should have been performed by secretaries, proofreaders, docketing departments, or mailroom clerks.

(8) No credit was given for any time spent preparing fee petitions.

Counsel have logged long hours in this case. On the whole, we did not find the hours spent excessive. We asked for and received statements from defense counsel revealing the hours their firms have spent on this case. We note that the hours spent by class counsel and their paralegals are generally consistent with the hours logged by the firms on the other side.

## V. Hourly Rates

█ As previously indicated, we have made certain adjustments in the number of hours reported by counsel to eliminate those which appeared to be non-compensable. Having arrived at the compensable number of hours for each attorney or paralegal, we come then to the question of reasonable hourly rates for each. Given the fact that lead counsel for the plaintiff class are recognized as among the most experienced and competent antitrust attorneys in the United States, we have determined that no counsel can reasonably be compensated at hourly rates in excess of those approved for lead counsel.

### A. *Attorneys*

We have reviewed the hourly charges requested by the twelve firms for the attorneys in each firm, partners and associates, who performed services for the plaintiff class. We received in confidence and also reviewed defense counsels' hourly charges. Based on that review, we determined reasonable hourly charges for each attorney. Some of these are less than the attorneys reportedly charge private clients. We have said before that private clients may by their own choosing pay slightly higher hourly rates than a court would reasonably award counsel in a class action, where most of the class members are not individual clients of their attorneys, who are serving as private attorneys general. *Folding Carton*, 84 F.R.D. at 265.

### B. *Paralegals*

█ There have been suggestions from time to time that paralegals are not profit centers and that fees for paralegals should be calculated from their hourly salaries rather than the substantially higher rate at which their work is usually billed out. In our opinion that is an unfortunate approach. The whole objective in utilizing paralegals is to reduce the cost of legal services to the public. Hourly rates for paralegals are lower than hourly rates for associates. In awarding fees, courts should generally focus on that fact. Disregarding it will result in work now performed by paralegals being returned to associates and, accordingly, in more costly legal services.

We have eliminated hours to the extent that paralegal time appeared to represent clerical work, such as messengering documents, opening mail, filing documents (in court or out) etc. Where, by contrast, paralegals performed substantive work that would otherwise have been performed by an attorney, we have determined reasonable hourly rates applying the same principles previously discussed.

## VI. Multipliers

Consistent with a fair allocation of the recovery in a class action between the members of the class and their attorneys, multipliers should compensate counsel for the risk they incurred in bringing a case in which their compensation was contingent on their success, should recognize any extraordinary performance by particular counsel and should encourage the filing of meritorious class actions. Straight hourly rates will rarely, if ever, accomplish these objectives. Accordingly, multipliers are appropriate.

█ There should be no arbitrary ceiling on multipliers. If a substantial result is magically achieved in record short time, the multiplier should reflect it. Such cases are, however, few and far between.

Multipliers should also compensate for the time value of money and the delay in payment, particularly where, as here, fees are calculated from historical hourly rates over the duration of the case. In this case, we have not only the delay to date but also a future delay, since the awarded fees are to be paid by the defendants in three installments over the next two years.

While multipliers should compensate for extraordinary skill not reflected in the hours and hourly charges, care must be taken to avoid double compensation. Higher hourly rates demand higher skills. And a difficult case normally will involve more hours. In short, the novelty or complexity of a case may already be reflected in the lodestar.

The multipliers requested in this case were, by and large, restrained. No firm requested a multiplier higher than 2.5. This is understandable in light of the fact that fees are to be paid directly in cash while discount certificates are to be issued to the class members. We have awarded multipliers between 1.5 and 2.5 depending on the relative contribution of the various class counsel.

VII. Fair Allocation

The final step, after a lodestar has been computed and enhanced by a multiplier, is to compare that aggregate figure with the recovery in the case to determine whether a fair allocation of the results between the class and their counsel has been achieved and to adjust the fees upwards or downwards accordingly. It is at this point that the percentage which the fees represent of the total recovery properly should be considered.

In this case, that comparison is more difficult than in most cases because of the nature of the settlement. The bulk of the settlement consists of discount certificates utilizable in 40 quarterly installments over the next ten years. The total dollar amount of the certificates to be issued will depend on the claims documented and approved and will range somewhere between $49 million and $70 million. Calculating the present value of those certificates depends on how many will ultimately be issued and what rate of interest is assumed. The following table reflects the possibilities depending on whether the minimum, median or maximum number of certificates are issued and what interest rates are assumed based on interest rates taken from the *Wall Street Journal* of October 24, 1990.

Present value of indicated total:

| Rate or instrument | Interest | $49,000,000.00 | $59,500,000.00 | $70,000,000.00 |
| --- | --- | --- | --- | --- |
| Prime rate | 10.00% | $30,750,899.44 | $37,340,377.89 | $43,929,856.34 |
| 30–year U.S. Bond | 8.80% | $32,364,554.93 | $39,299,816.70 | $46,235,078.47 |
| 10–year U.S. Bond | 8.61% | $32,631,449.12 | $39,623,902.50 | $46,616,355.89 |

As the table reveals, the present value of the discount certificates ranges from a minimum of $30,751,000 to a maximum of $46,616,000 with a median of $38,683,627, depending on the interest rate assumed. To arrive at a present value figure for the entire settlement, of course, one must also add the cash on deposit from the settlements with other defendants, currently some $13,865,000;[5] an estimated $1,500,000 in administration expenses which defendants have agreed to pay; $4,000,000 deposited by defendants to cover litigation expenses; $50,000 deposited by defendants to pay for notices to the class; and, finally, the fees previously awarded counsel and the present value of the fees awarded now.

Without the attorneys fees and utilizing the median present value of the discount certificates, the present value of all the settlements with all the defendants is $58,-

098,627. Taking the minimum figure for present value of the certificate, it is $50,-166,000 and taking the maximum it is $65,-650,078.

In calculating the total fees to be awarded, we must, of course, include the $1,730,000 previously awarded by Judge Rovner in connection with the earlier settlements for services performed from January 26, 1983 through July 31, 1986.

As the attached Schedule A indicates, we are currently awarding fees aggregating $11,480,163. The present value of those fees assuming a 10% prime rate of interest is $10,466,082. Based on a 7.82% interest rate (the current rate on 24 month Treasury Notes) the present value is $10,667,367. Adding the previous fees of $1,729,580 results in total fees of either $12,195,661 (on the 10% interest basis) or $12,396,947 (on the 7.82% interest basis).

5. We have not attempted to add back expenses paid out of the settlement escrow fund or to deduct the interest earned by that fund.

The percentage of the total recovery represented by the total fees is 15.6%, using a 10% interest rate to calculate the present value of the fees and assuming the present value of the settlement to be the maximum valuation of $77,855,739 ($65,650,078 discount certificates and cash plus $12,195,661 attorneys fees). It is 17.3% of the median valuation of $70,294,288 ($58,098,627 plus $12,195,661) and 19.5% of the lowest valuation of $62,361,661 ($50,166,000 plus $12,-195,661).[6]

Preliminary indications, based on the purchases of glass containers by the class members during the period for which damages are recoverable is that most if not all of the discount certificates will be issued to class members. If so, the fees will ultimately represent between 15.6% and 17.3% of the recovery.

### CONCLUSION

Given all the factors previously discussed, we deem the individual as well as the aggregate fees to be fair and reasonable compensation for counsel in light of all the considerations relevant to such a determination. An order reflecting these determinations will be entered unless valid objections are presented thereto at the hearing on October 29, 1990.

### PROPOSED FINAL JUDGMENT ORDER

WHEREAS, the plaintiff class heretofore certified in this litigation (hereinafter "Plaintiff Class") has alleged that defendants Owens–Illinois, Inc., Owens–Brockway Packaging, Inc., as successor in interest to the assets and liabilities of Brockway, Inc. (NY) and Dart Industries Inc. (hereinafter collectively "defendants"), violated federal antitrust laws in connection with the manufacture and sale of glass containers, and defendants have denied these allegations and raised certain affirmative defenses thereto;

WHEREAS, as of June 15, 1990, defendants entered into a settlement agreement (hereinafter "Settlement Agreement") with the Plaintiff Class; and

Following a hearing on August 8, 1990, after notice to the Plaintiff Class, GOOD CAUSE APPEARING THEREFOR, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED:

1. The Settlement Agreement entered into between the parties is approved as fair, reasonable, adequate, equitable, and in the best interest of the foregoing class. The Court finds that the only purported objection was not filed on time, was not supported in person at the hearing on August 8, 1990 as required by notice to the Plaintiff Class, and, in any event, is wholly invalid.

2. For purposes of entering this judgment, this Court has jurisdiction over the subject matter of this litigation, over defendants, and over each member of the Plaintiff Class.

3. Judgment shall be and it is hereby entered, dismissing this action with prejudice, each party to bear its own costs, except as provided in the Settlement Agreement. This Judgment shall bind each and every member of the Plaintiff Class, their respective predecessors, successors and assigns. Plaintiff Class shall include "[a]ll persons, firms, corporations or other entities in the United States (excluding defendants in all related cases and other manufacturers of glass containers, and all glass container distributors in the United States, their respective parents, subsidiaries and affiliates) that purchased glass containers for commercial packaging or bottling during the period from January 1, 1970 to December 31, 1982 from any defendant in any of the related cases or any parent, subsidiary or affiliate thereof." Plaintiff Class expressly includes all of the named plaintiffs in each of these following actions:

*Superior Beverage Co. v. Owens–Illinois, Inc., et al.,* 83 C 0512

*Pastorelli Food Products, Inc. v. Owens–Illinois, Inc., et al.,* 83 C 0964

*Korbro Oil Corporation v. Owens–Illinois, Inc., et al.,* 83 C 8388

---

**6.** Using the slightly higher present value of the current fees based on a 7.82% assumed interest rate results in a .2% higher fee percentage, i.e., 15.8%, 17.5% and 19.7%.

*G. Heileman Brewing Co., v. Owens–Illinois, Inc., et al.,* 84 C 2127

*Contract Beverages, Inc., v. Owens–Illinois, Inc. et al.,* 84 C 5594

Plaintiff Class shall not include any person, firm, or corporation which timely opted out of the Plaintiff Class and excludes the pending claims of Thomas J. Lipton, Inc. and Lever Brothers Company (Incorporated) for the post–1982 time period.

4. Defendants jointly and severally shall pay to the firms listed on the attached schedule, as attorneys fees, the amounts set forth in the schedule with respect to each firm. The attorneys fee for each firm shall be payable in three equal installments as follows: The initial payment shall be made within five days after this date, no timely, proper and valid objections having been filed to any of the fee awards in the attached schedule, with the succeeding two payments to be made annually thereafter on the anniversary date of this Judgment.

The Clerk is directed to enter Judgment in this case in accordance with this Final Judgment.

## APPENDIX
## SCHEDULE A

### Attorneys and Paralegal Fees

|  | Current | Previous | Total |
| --- | --- | --- | --- |
| Specks & Goldberg | $ 3,482,100 | $ 446,816 | $ 3,928,915 |
| Altheimer & Gray | $ 2,042,720 | $ 291,913 | $ 2,334,633 |
| Saveri & Saveri | $ 1,425,960 | $ 231,060 | $ 1,657,020 |
| Much, Shelist, Freed, Denenberg, Ament & Eiger | $ 1,455,200 | $ 127,389 | $ 1,582,589 |
| Wechsler, Skirnick, Harwood, Halebian & Feffer | $ 973,344 |  | $ 973,344 |
| Meredith & Cohen | $ 970,762 | $ 28,256 | $ 999,018 |
| Phillip C. Goldstick & Assoc. | $ 546,493 | $ 93,290 | $ 639,783 |
| Edward A. Berman, P.C. | $ 342,668 | $ 16,346 | $ 359,014 |
| Doherty, Rumble & Butler | $ 74,179 | $ 17,686 | $ 91,865 |
| Meites, Frackman & Mulder | $ 110,929 |  | $ 110,929 |
| Kenneth H. Hanson | $ 33,008 | $ 5,586 | $ 38,594 |
| Francis J. McConnell | $ 22,800 |  | $ 22,800 |
| Others |  | $ 471,237 | $ 471,237 |
| TOTAL | $11,480,163 | $1,729,580 | $13,209,741 |